**CALIFORNIA PACKING CORPORA-TION, a corporation, Libelant,**

v.

**THE SS P & T VOYAGER, her engines, boilers, tackle, apparel and furniture, Pope & Talbot, Inc., et al., Respondents.**

**CALIFORNIA PACKING CORPORA-TION, a corporation, Libelant,**

v.

**THE SS P & T BUILDER, her engines, boilers, tackle, apparel and furniture, Pope & Talbot, Inc., et al., Respondents.**

Nos. 27828 and 27829.

United States District Court
N. D. California, S. D.
Jan. 8, 1960.

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey and Bryant K. Zimmerman, San Francisco, Cal., for plaintiff.

Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for defendant.

ROCHE, District Judge.

These two actions, having now been consolidated, were brought for damages to canned goods shipped aboard the SS P & T Voyager and the SS P & T Builder from various ports on the west coast to various ports on the east coast. The court is limited to a determination of liability, the issue of damages having been reserved for determination at a later time.

### The Voyager

The P & T Voyager began voyage Number 29 on December 1, 1956 at Portland, Oregon, discharging cargo and loading canned goods in generally cloudy weather with temperatures ranging between 40° and 53°. The vessel moved to Seattle on December 3 and proceeded to discharge cargo from all hatches. The log records rain at noon and it is noted that a protective tent was rigged at Number 2 hatch. Discharge continued on December 4 in cloudy weather with occasional light rain and temperatures in the low 40's. On December 5, the temperature plunged below freezing and snow fell through the morning hours while the stevedores continued to discharge cargo from Numbers 3, 4 and 5 holds. The temperature fell to a low of 18° on December 6. In the afternoon, the Voyager moved to Olympia, Washington and commenced loading cargo at all hatches. There was a light snowfall at 2200 hours. Temperatures were in the 30's. Constant precipitation, varying from light snow to heavy rain, is recorded through December 8 and 9 while loading continued at all hatches—with the exception of a two-hour suspension during the afternoon of December 9 attributable to heavy rain. The vessel loaded cargo in light rain on the 10th and departed for Port Gamble, Washington in the afternoon. The temperature had climbed into the 50's. At Port Gamble, the Voyager loaded lumber at all hatches in overcast and rainy weather on December 11. The temperature hovered about the high 40's with occasional rain for the next 3 days while the vessel continued to load cargo. On December 14, she departed for the San Francisco Bay area, arriving at Oakland on the 16th. For the next 2 days, the Voyager loaded cargo in the Bay area—including canned goods—in clear to partly cloudy weather with temperatures generally in the 50's.

Libelant's cargos were loaded at Portland, Oakland and Alameda and were carried in the Numbers 1, 3 and 4 upper tween deck holds. Dried fruit, cherries, and bales of flax and seed were carried in the same compartments as the canned goods. The remaining 12 compartments —accounting for the great bulk of available cargo space—were filled with lumber.

The Voyager departed for east coast ports via the Panama Canal on December 19. The log notes that all cargo hold ventilators were covered on that day. The voyage was uneventful and the weather warmed gradually as expected, reaching a high of 84° on December 26.

The Voyager left the Canal Zone on December 28 and the weather cooled as she proceeded north. At 0800 hours on January 1 the cargo hold vents were opened for ventilation. The temperature had fallen to 57° and continued to fall precipitously as the vessel left the gulf stream. At 1900 hours the Voyager tied up at Norfolk. On January 2, with temperatures in the high 20's, four gangs of stevedores came aboard to discharge canned goods from Numbers 1, 3 and 4 holds. The log notes, "Examination of No. 3 hold shows slight continual sweating in area of deck-head outside locker at aft end. Warm, moist air drifting up from lower hold through exhaust vents." Marine Surveyor J. McIntyre came aboard at 1530 hours to survey the cargo for moisture damage and the Voyager departed for Baltimore soon after.

## The Builder

The P & T Builder began loading cargo for voyage Number 31 on January 27, 1957 at Portland, Oregon, in clear weather with temperatures ranging from 12° to 23°. After 2 days spent at Swan Island shipyard undergoing minor repairs, she returned to Portland early on January 30 and loaded cargo for the next 4 days. There was almost continuous light rain and snow during this period, temperatures varying from a low of 18° to a high of 44°. On February 3, the Builder moved to Coos Bay, Oregon and remained there until February 7, loading cargo in rainy and snowy weather with temperatures generally above freezing. On February 8, she arrived at Oakland. For the next 2 days she loaded cargo in overcast weather with temperatures in the high 40's and low 50's. The log notes that at 1630 hours on February 10 all ventilators and escape trunks were closed.

Libelant's cargos were loaded at Portland and Oakland into the Numbers 1, 3 and 4 upper tween deck holds, for delivery at Norfolk and Baltimore. The remaining cargo compartments were filled with lumber.

On February 10, the Builder departed for east coast ports via the Panama Canal. The weather warmed as the vessel proceeded south, reaching a high of 84° on February 16 and 18. The Builder passed thru the Canal on February 19 and encountered slightly cooler weather as she came north again. At 1300 hours on February 24, the vents in Numbers 1, 3 and 4 holds were opened for ventilation. The temperature had fallen into the low 50's as the vessel passed out of the gulf stream. By midnight she was secured at Norfolk. At 0800 hours on February 25, five gangs of stevedores commenced discharging cargo from the Numbers 1, 3 and 4 holds. Shortly thereafter, several damp cases of canned goods were found in the center of the stows in the Numbers 3 and 4 upper tween deck holds. At 1045 hours marine surveyor McIntyre came aboard to inspect the cargo for possible sweat damage. Later in the day the Builder departed for Baltimore.

## Discussion

The rights and duties of the parties are set forth in the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. §§ 1300–1315. Libelant contends that respondent failed in its obligation to properly and carefully load and stow its cargos. Respondent alleges that it exercised reasonable care at all times and that libelant's loss is attributable to concealed vice in the goods, insufficiency of packing and/or a peril of the sea.

During the course of trial, respondent moved to dismiss the actions on the ground that libelant had failed to establish prima facie cases. His motion was denied and his argument, repeated in respondent's brief, must again be rejected. Libelant's "clean" bills of lading are prima facie evidence of good order and condition, which, in the absence of an affirmative showing to the contrary or the strong possibility of concealed vice in the goods, are satisfactory to satisfy libelant's burden. Karabagui v. The Shickshinny, D.C.S.D.N.Y.1954, 123

F.Supp. 99, affirmed Kupferman v. United States, 2 Cir., 1955, 227 F.2d 348. There is nothing in the record to cast material doubt upon libelant's contention that the shipments were in sufficiently good order and condition to withstand the ordinary hazards of intercoastal voyages. The nature of these standard and uniform canned goods is such that the possibility of inherent vice is remote. Libelant's damages consisted of rust and spoiled labels caused by sweat, i. e., condensation, which formed on the cans while the goods were in transit and in the care of respondent. Sweat is primarily the result of atmospheric conditions and material temperatures and there is no reasonable basis for belief that any concealed vice in the goods could have contributed to its occurrence. Producers Cooperative Packing Co. v. States Marine Corporation of Delaware, D.C.N.D.Cal., 180 F.Supp. 19.

■ The danger of sweat is not unusual on intercoastal voyages during the winter. But sweat is considered to be a peril of the sea only when all available and reasonable precautions are taken to avoid it. If the damage resulting therefrom could have been avoided by the exercise of proper care, then the carrier is liable. Clark v. Barnwell & Ravenal, 1851, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985; Wessels v. The Asturias, 2 Cir., 1942, 126 F.2d 999. The burden of explanation is upon the carrier. He is prima facie liable for the damage unless he can affirmatively show that the cause is one for which the law does not hold him responsible. Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. In this case, to avoid liability respondent must demonstrate that it did everything reasonably possible to protect libelant's cargos and that the damage is attributable to causes which he could not avoid or control by the exercise of due care.

■ In actual practice, the obligation of the carrier on intercoastal voyages during the winter is to take whatever measures are reasonable and proper to prevent the warm, humid air of the tropics—through which the ships must pass—from entering the holds in which the shipper's cold canned goods are stowed. The reason is clear: sweat occurs when the temperature of the air falls below its dew point. Hence, if the tropical air—which has a high dew point—enters the hold, it will be cooled by the cold cargo and produce sweat. A customary and accepted precautionary measure employed by carriers—and the one used by respondent—is to seal the holds when the voyage commences and to keep them sealed until the weather has cooled. In many cases, depending upon the moisture content of the cargos, it is also necessary to seal off the individual compartments in each hold to prevent the flow of water vapor from moist cargos to other cargos which are sensitive to moisture, such as canned goods.

■ On both the Voyager and the Builder, the canned goods in question were carried in three upper tween deck compartments, the remainder of the cargo space on both vessels being devoted to the stowage of lumber. The record reveals that the lumber contained a high moisture content. The chief mate on the Voyager testified in his deposition that "wet dripping loads of lumber were being hoisted aboard and stowed in the holds running with water." The chief mate on the Builder testified that he ventilated the cargo holds before arriving in Norfolk because "the lumber was still steamy and warm down there, probably, and I wanted to cool off that." Respondent offered considerable testimony regarding the methods by which the various compartments in each hold were sealed off from one another, the necessity of which is not disputed because of the high moisture content of the lumber. Yet it is apparent from the depositions that nothing was done to block the scupper holes, or drains, leading from each compartment in a hold to a common reservoir —the bilge. Hence, regardless of whether or not the ventilator openings, doors, etc., were effectively sealed, it was a sim-

ple matter for water vapor to circulate among the various compartments in each hold. The court must conclude from the foregoing that the lumber gave off substantial amounts of moisture during the voyages and that a significant portion of it reached the compartments in which the canned goods were stowed, constituting an effective cause of sweat. Furthermore, there is considerable doubt that the holds were effectively sealed to prevent the entrance of outside air. The log of the Voyager noted—after arrival at Norfolk—that warm, moist air was drifting up from the lower holds. A survey of the Builder's cargo after arrival at Norfolk found the temperature of the canned goods loaded at Portland and Oakland to be 53° and 61°, respectively, indicating they had warmed considerably during the voyage. It is only reasonable to infer from the foregoing that a significant amount of warm air did enter the holds. Respondent did not fulfill its obligation to properly stow and care for libelant's cargos, or at least it has not convinced the court that it did.

The evidence offered by respondent concerning the practices employed in loading the two vessels again falls short of demonstrating that due care was taken to protect libelant's cargos. On December 6, an entry was made in the Voyager's log stating that snow-covered angle iron was loaded in the Number 3 upper tween deck compartment, that the longshoremen were given brooms and told to sweep it clean, but some snow still clung to the iron that was loaded. Libelant's goods were stowed in the same compartment.

Hatch tents—normally used to protect the holds while loading in inclement weather—cannot be used while lumber is being loaded. The only protection available is to hang tarpaulins into the holds to prevent the rain from wetting the cargo stowed in the tween deck compartments. There is no indication in the log of the Builder that hatch tents or tarpaulins were used at any time during the 9 days on which precipitation was recorded in the period of loading. The chief mate, when asked if it is noted in the log that tarpaulins are hung, replied, "Sometimes we do and sometimes we don't." The Voyager's log contains only one entry that a tent was rigged, that being at Number 2 hatch on December 3. At the time cargo was being discharged from all hatches in the rain. The Voyager's chief mate, testifying in regard to loading during the "heavy rain" of December 9, admitted that it was impossible to keep water "entirely out of all" of the tween decks." There were 11 days on which precipitation was recorded while loading the Voyager. The chief mate also testified that "there was quite an accumulation of water in the bilge from the rain." Hence, the evidence offered by respondent's own witnesses is sufficient to cast material doubt upon respondent's allegation that all reasonable precautions were taken during loading.

Respondent neither alleged nor attempted to demonstrate that the damage incurred was attributable to unusual weather conditions or to any other extraordinary or unexpected circumstances beyond its control. In fact, respondent mentions in its brief that the weather was less severe during loading than would ordinarily have been expected. Hence, respondent has not only failed to convince the court that its conduct was blameless, but in addition, has failed to establish a reasonable alternative to its own negligence as a probable cause for the damage. Producers Cooperative Packing Co. v. States Marine Corporation of Delaware, supra.

The court finds that respondent is liable for sweat damage suffered by libelant's canned goods shipped aboard the SS P & T Voyager and SS P & T Builder on voyages 29 and 31, respectively. Libelant will submit proposed Findings of Fact and Conclusions of Law in accordance with the foregoing.