**William SAWYER, Petitioner,**

v.

**Maurice H. SIGLER et al., Respondents.**

**Lyle H. BARTHOLOMEW, Petitioner,**

v.

**Maurice H. SIGLER, Respondent.**

**Carl BECKER, Petitioner,**

v.

**Maurice SIGLER, Respondent.**

**Civ. Nos. 1646L–1648L.**

United States District Court,
D. Nebraska.

Dec. 23, 1970.

Donald E. Endacott, Lincoln, Neb., for petitioners.

C. C. Sheldon, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, District Judge.

Three inmates of the Nebraska Penal and Correctional Complex have filed sep- arate actions, consolidated for trial, un- der the Civil Rights Act, Tit. 42, § 1983, which provides relief for anyone who has been deprived of rights secured by the Constitution of the United States by any person acting under color of state law. They allege that they have received in- adequate medical treatment during their imprisonment, that they have been sub- jected to a policy whereby all pills and capsules of a medicinal nature are to be crushed or broken apart before being given to the inmates, and that they have been denied statutory and meritorious good time while being idle because of hos- pitalization or cell lay-ins.

## WILLIAM SAWYER

William Sawyer, according to the evi- dence, is 52 years of age and began con- finement in the Nebraska Penal and Correctional Complex on May 20, 1967. At the beginning of the confinement a diagnosis of emphysema was made by Dr. George E. Lewis, Chief Medical Of- ficer. One year later, Dr. Lewis describ- ed the condition as a "chronic, obstruc- tive lung disease" and recommended a shift in housing, a recommendation hon- ored by the prison authorities. On No- vember 26, 1969, Dr. John J. Hanigan, a prison physician, reviewed chest x-rays of Sawyer and found that "his emphy- sema has become progressively worse since he has been confined to the peni- tentiary. He has a chronic lung disease and facilities to treat him here are very limited." Symptoms were and are short- ness of breath and a constant ache in the lower chest and back. Numerous medications, including Darvon since Oc- tober 31, 1969, and Equanil since July 1, 1970, have been supplied for the condi- tion. An additional medication, referred to by Sawyer as "elixolofin" and appar- ently referred to in the medical records as "Elixo", was administered from about September 15, 1967, until the present. It gives immediate temporary relief in breathing. X-rays of the chest were taken June 12, 1967, January 23, 1968, October 2, 1968, November 7, 1969, and the latter part of August, 1970. A type

of treatment described by Sawyer as pressure inhalation treatments was begun about six weeks before the trial and about four or five months after the filing of this action, which means that such treatments began about August 1, 1970. The plaintiff states that he received two such treatments per week until sometime after the commencement of the trial on September 17, 1970, after which the number of treatments was reduced to one per week. The plaintiff claims that the pressure inhalation treatments were and are given without the recommendation of a radiologist as to the advisable frequency and urges the court to appoint a radiologist to examine him or to require the penal institution to obtain a radiologist to determine what treatments are necessary. The plaintiff also indicates that Dr. Lewis "talked about" pressure inhalation treatments as much as two years ago, but there is no indication that any prison physician recommended such treatments before January, 1970, and the plaintiff intimates that Associate Warden R. B. Jones intervened, saying that such treatment was not "appropriate at this time." The plaintiff Sawyer sought a medical discharge through the Nebraska Board of Parole for the purpose of receiving treatment at Iowa University Hospital, but the request was denied in the early part of 1970.

Beginning about September 1, 1970, the penitentiary instituted a policy requiring that all medication be taken in crushed or liquid form. Sawyer testified that after the commencement of that policy he placed his medication in cigarette paper and swallowed the medicine and the cigarette paper in order to keep from being nauseated. He takes medication three times a day and before beginning of the policy he received it in pill or capsule form. The undisputed evidence is that Dr. Hanigan directed that Sawyer's medication not be crushed, but that the warden directed that Sawyer's medication would be crushed. Additionally, the evidence is that after September 21, 1970, Sawyer has been forbidden from wrapping his crushed medication in paper

before swallowing it and his consuming the crushed pills has caused him to become nauseated. The policy against taking of medication in pill or capsule form was instituted because of the tendency of some prisoners to hoard narcotics.

On the basis of the evidence, this court cannot conclude that the prison authorities either have rendered cruel or unusual punishment or have failed to provide constitutionally required medical treatment to the plaintiff Sawyer, except with respect to the requirement that he take his medication in crushed or liquid form. As to the adequacy of the treatment for emphysema, there is no persuasive evidence that the type or frequency of medication or the nature or frequency of the pressure inhalation treatments is not in thorough accord with the recommendations of the prison physicians. While the opinion of a specialist might be highly desirable, this court must leave to the prison physicians the exercise of good judgment regarding medical treatment. This standard is clearly expressed by the court of appeals whose directives this court must respect. In Cates v. Ciccone, 422 F.2d 926 (C.A. 8th Cir. 1970) the court said:

"The prisoner cannot be the ultimate judge of what medical treatment is necessary or proper for his care. * * In the absence of factual allegations of obvious neglect or intentional mistreatment, the courts should place their confidence in the reports of reputable prison physicians that reasonable medical care is being rendered. The district courts cannot become a forum to enjoin prison authorities for alleged negligence in rendering medical care to prisoners under the guise of habeas corpus or in any other action seeking injunctive relief."

As to the crushing of the pills and capsules and requiring the taking of all medications in crushed or liquid form without even the protection against nausea of the crude device of cigarette papers, however, there is positive evidence that a prison physician has indi-

cated that Sawyer's medication should not be so taken, but that the administrative officials have overruled that recommendation. As the courts should be guided by physicians as to their judgment that adequate medical treatment is being rendered, so the courts should be guided by those same physicians that inadequate medical treatment is being rendered. It is fully understood that prison officials must be permitted to enforce reasonable regulations for the orderly operation of a prison and for the safety and health of all prisoners, including those directives reasonably designed to prevent abusive use of drugs. But no effort has been made in this case to show that Sawyer has or ever has had any tendency to hoard narcotics or that a policy against hoarding cannot reasonably be carried out on a selective basis. In the absence of that kind of showing, I conclude that requiring Sawyer to take his medication in a form which results in nausea is sufficiently unusual, exceptional and arbitrary to constitute both cruel and inhuman punishment and a denial of adequate medical treatment, as required by the Eighth and Fourteenth Amendments.

## LYLE H. BARTHOLOMEW

Lyle Howard Bartholomew, age 52, has been imprisoned at the Nebraska Penal and Correctional Complex since August 29, 1968, on a conviction of forgery to serve six to eight years.

In 1938 Bartholomew developed a tumor on the left arm, which was surgically removed by a military physician while Bartholomew was in the army. In 1947, also when he was in the army, a tumor was located on one of his buttocks. The tumor was removed in an army hospital. In April, 1956, an orchiectomy, an excision of the left testis and complete excision of the cord, was performed at the prison hospital of the Texas Department of Corrections. The testicle was sent to the M. D. Anderson Hospital and Tumor Institute, Houston, Texas, for study. The diagnosis was mixed embryonal carcinoma and seminoma of the testicle. Rad-

ical retroperitoneal lymph node dissection, followed by radical radiation, was indicated by the M. D. Anderson Hospital and Tumor Institute as the treatment of choice. Bartholomew testified that he received radical radiations twice, once at the medical center at Springfield, Missouri, in about 1958 or 1959 and once at the Memorial Center in New York at an unspecified date. He has not had the surgery referred to as radical retroperitoneal lymph node dissection. He states that he was told at the time of the initial biopsy at the M. D. Anderson Hospital and Tumor Institute in 1956 that the condition had metastasized or broken loose from the parent tumor. No reference to that is found in the medical records in evidence, except in the classification study at Leavenworth in 1958, where the diagnosis includes, "Probable systemic carcinoma metatases—Iradiation indicated?" Whether the word "metatases" should have been "metastases" cannot be determined positively, but probably it should have been.

At the time of his admission into the Nebraska Penal and Correctional Complex in 1968, according to his testimony, Bartholomew had swelling in the lymph glands and throat and pain in his jaw. Presently he has swelling in the lymph glands and throat, continuous pain on the left side of his jaw and throat, his ears are running, his eyes are becoming infected, he has pain in his joints and on his left side, he has irregular movements, he passes blood occasionally, and he has trouble eating and retaining food. He states that he has lost approximately 20 pounds in the past three to five months. At the time of his commencement of incarceration at the Nebraska Penal and Correctional Complex Dr. George E. Lewis, Jr. made a general physical examination of Batholomew and at that time Bartholomew requested laboratory tests and biopsies, but none were performed. He also asked Dr. Hanigan at one time for similar tests, but nothing came of it. In 1970, after the filing of the present action and probably in May or June, Dr. Swanson, a prison physician, recommend-

ed to the deputy warden and the associate warden that Bartholomew needed an examination or treatment outside the facilities of the Nebraska Penal and Correctional Complex. Shortly thereafter the associate warden told Bartholomew that he, the associate warden, was trying to make arrangements for Bartholomew's admission to the Veterans Administration Hospital in Lincoln, Nebraska. About a month or six weeks before the trial of this matter the Veterans Administration Hospital communicated to the Nebraska Penal and Correctional Complex that it could not admit Bartholomew as a patient.

Bartholomew was able to work at the Nebraska Penal and Correctional Complex until about April, 1970, when he became lethargic and since then has been unable to do anything, except to get back and forth to the mess hall. He has been put on unassigned status, so that he is not required to work.

■ The record is devoid of any indication that Bartholomew has received any medical treatment, except the administration of medication for pain, for the symptoms he has related or the malignancy which may or may not be at the root of the problem. Although there is indication that the authorities at the Nebraska Penal and Correctional Complex have made some effort to have him treated at an outside hospital, those efforts have not been fruitful and there is not the slightest explanation in the evidence as to why no treatment has been rendered or why, if treatment must be rendered at an outside facility, no arrangements have been made in the more than two years of his present incarceration and, more particularly, during the several months since the prison doctor recommended it. Whether this case be considered one of obvious neglect or intentional mistreatment, it is clear that the proper standard of adequate medical treatment has not been accorded Bartholomew. An order will be entered directing the warden of the Nebraska Penal and Correctional Complex to provide for

Bartholomew an examination by a specialist in cancer and allied diseases, whether within or without the Nebraska Penal and Correctional Complex, including such biopsies and other tests as such specialist deems advisable, all within 30 days of the date of the order, and thereafter to provide such treatment as such specialist in consultation with one or more physicians employed by the Nebraska Penal and Correctional Complex deem advisable, insofar as such treatment reasonably is available. The court will retain jurisdiction of the case for the purpose of being informed of the examination and treatment at periodic intervals.

■ With respect to the crushing of pills and capsules, the evidence is that when Bartholomew's medication for pain is taken in crushed or liquid form it becomes effective much more quickly than if taken in pill form and looses its effectiveness sooner, so that medication taken at 9:00 p. m. has lost its effect by 3:00 or 3:30 a. m. There is no direct evidence that the prison physician has asked that Bartholomew's medication not be in crushed or liquid form. Neither is there any evidence that the taking of medication in liquid or crushed form meets with such physician's approval. On that subject the court has been left only with what inferences may be drawn from the testimony of Sawyer, which indicates that the prison officials formulated the policy respecting medication without appreciable influence from the physician or physicians on the staff. It seems to me to be the better policy to place upon the respondent Sigler the burden of showing that the matter of guarding against abusive use of drugs cannot be done by the administration of those drugs selectively, that is, to selected persons, and in the absence of such showing that the practice of requiring all prisoners to take all medications in crushed or liquid form constitutes inadequate medical treatment or cruel and unusual punishment, particularly where the prison physician has not indicated that medication furnished to a particular prisoner

in crushed or liquid form is reasonably effective to accomplish the desired medical purpose of that medication.

## CARL BECKER

This petitioner, now 50 years of age, was first imprisoned at the Nebraska Penal and Correctional Complex on September 26, 1968, to serve five years. The eye condition of glaucoma was first diagnosed in July, 1961, by Dr. Irving Spiro at the University of Minnesota. The condition was controlled with drops until 1966, at which time he was taken to Iowa City, Iowa, where in early 1967 the Scheie procedures, which are types of surgery, were done on both eyes. As a result, the pressure which forms within the eyes seemed to be well controlled but visual acuity in the right eye was 20/70 and he could see only hand motions in the left eye. Glaucoma was recognized by the prison physician at the Nebraska Penal and Correctional Complex at the time of the petitioner's admission to that institution in September, 1968. On October 30, 1969, Dr. Hanigan of the Nebraska Penal and Correctional Complex observed that there was no facility at the penitentiary to follow a patient with chronic glaucoma and suggested that follow-up be carried on through an ophthalmologist in downtown Lincoln, Nebraska. The petitioner previously had been examined by an ophthalmologist, Dr. Roy F. Statton, in Lincoln on April 5, 1969, at which time the petitioner's vision was 20/200 in the right eye and only light perception in the left eye. Dr. Statton observed that it was difficult for him to explain any marked loss of vision in both eyes when the retina and optic nerve appeared normal and he could not account for the pain in the petitioner's eyes. Dr. Statton suggested that he have the pressure in the eyes measured periodically, which he indicated should be every three to four months. On December 22, 1969, Dr. Statton again examined Becker and found by slit lamp and fundus examination that the condition of the eyes was exactly the same as it had been at the time of the previous examination by Dr. Statton on April 5, 1969. Intraocular pressure was in the low normal range in both eyes and the retina and the optic nerve appeared healthy in both eyes. The petitioner, according to Dr. Statton, was able to walk from the examining room down a rather narrow corridor and through the reception room without difficulty. This suggested to Dr. Statton that the petitioner was malingering. Dr. Statton concluded that the glaucoma "is well controlled in both eyes, and in my opinion consultation in Iowa City is unnecessary." This latter observation was in response to Becker's request that he be sent to University Hospital in Iowa City for an eye examination.

The petitioner has not been examined, apparently, since December, 1969, and has not been on medication for his eye condition, except that "Eye-Mo," which the petitioner describes as being something like Murine, has been available to him all the time during his incarceration in the Nebraska Penal and Correctional Complex.

Becker has communicated with the Division of Rehabilitation Services for the Visually Impaired of the State of Nebraska and arrangements have been made for him to receive services from that division upon his release from the Nebraska Penal and Correctional Complex.

■ The power of this court is to measure the adequacy of the petitioner's medical treatment within the framework only of the Constitution of the United States. It is not for this court to say that better or more regular examinations could or could not have been made. If the treatment or lack of treatment of a prisoner is such that it amounts to indifference or intentional mistreatment, it violates the prisoner's constitutional guarantees. When a state undertakes to imprison a person, thereby depriving him largely of his ability to seek and find medical treatment, it is incumbent upon the state to furnish at least a minimal amount of medical care for whatever conditions plague the prisoner. In the pres-

ent case it is obvious that there has been no indifference or intentional mistreatment of Becker. While the facilities at the institution itself are not adequate to treat chronic glaucoma, the State of Nebraska has afforded to Becker two examinations by an ophthalmologist, who, at the latest examination in December, 1969, found that the condition was well controlled and found that there was no need for transporting the petitioner to another medical institution for evaluation. Although it may be that during 1970 some further check of the pressure of the eyes should have been made, this court cannot say that failure to do so violates the petitioner's constitutional rights.

No showing has been made by Becker that the requirement of taking medication in crushed or liquid form has had any effect upon him. Accordingly, his assertion that the policy is a violation of petitioner's right to essential medical treatment is rejected.

## LOSS OF STATUTORY AND MERITORIOUS GOOD TIME

In 1969 the Nebraska Legislature adopted L.B. 1307, effective August 25, 1969, revising materially the rules regarding the conduct of state institutions, including the Nebraska Penal and Correctional Complex. Regarding the reduction of sentences, a portion of that act, now designated § 83–1,107 Nebraska R.R.S.1943, as amended, provides:

"(1) The chief executive officer of a facility shall reduce for good behavior and faithful performance of duties while confined in a facility the term of a committed offender sentenced as follows: Two months on the first year, two months on the second year, three months on the third year, four months for each succeeding year of his term and pro rata for any part thereof which is less than a year. In addition, for especially meritorious behavior or exceptional performance of his duties, an offender may receive a further reduction, not to exceed five days, for any month of imprisonment. The total of all such reductions shall be deducted:

(a) From his minimum term, to determine the date of his eligibility for release on parole; and

(b) From his maximum term, to determine the date when his release under supervision becomes mandatory under the provisions of section 83–1,111.

"(2) Reductions of such terms may be forfeited, withheld and restored by the chief executive officer of the facility after the offender has been consulted regarding the charges of misconduct. No reduction of an offender's term shall be forfeited or withheld after an offender is released on parole."

Section 83–183 Nebraska R.R.S.1943, as amended, provides in part:

"(1) To establish good habits of work and responsibility, to foster vocational training, and to reduce the cost of operating the facilities, persons committed to the Division of Corrections shall be employed so far as possible in constructive and diversified activities in the production of goods, services and foodstuffs to maintain the facilities, for state use and for other purposes authorized by law. To accomplish these purposes, the Director of Corrections may establish and maintain industries and farms in appropriate facilities, and may enter into arrangements with any other department or agency of the state for the employment of persons committed to the division for state purposes.

(2) The Director of Corrections shall make rules and regulations governing the hours, conditions of labor, and the rates of compensation of persons committed to the division. * * *

* * * * * *

"(6) No person committed to the division shall be required to engage in excessive labor, and no such person shall be required to perform any work for which he is declared unfit by a physician designated by the Director of Corrections."

Furthermore, § 83–185 Nebraska R.R. S.1943, as amended, provides in part:

"(1) The chief executive officer of each facility shall be responsible for the discipline of those persons committed to the Division of Corrections who reside therein. No person shall be punished except upon the order of the chief executive officer of the facility; nor shall any punishment be imposed otherwise than in accordance with this section.

"(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of assault, escape, attempt to escape or other flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83–1,107 be forfeited or withheld and also that the person be confined in a disciplinary cell. * * * "

Following enactment of the foregoing statutory provisions the respondent Maurice H. Sigler, who is the officer designated in such statutory provisions as the Director of Corrections, promulgated the following policy:

" 'Any person, being idle for any reason, will not receive either Statutory or Meritorious Good Time. This includes hospitalization, cell lay-ins, isolation and segregation.'

"The exception to this rule will be: 'In the event a person is injured in the performance of his regular assigned duties, he will receive Statutory Good Time.' "

■ In the present cases Sawyer, Bartholomew and Becker have been relieved of all work assignments and within the meaning of § 83–183(6) have been declared unfit by a physician designated by the respondent Maurice H. Sigler. It is clear from § 83–185 that the elimination or withholding of statutory or meritorious good time cannot be imposed as punishment, except in flagrant or serious cases of misconduct, such as assault, escape, or attempt to escape. The reduction of a sentence "for good behavior and

faithful performance of duties" is a mandatory requirement under § 83–1,107. That reduction of sentence, therefore, becomes a statutory right, as opposed to a mere privilege.

■ No attack is made on the statutes on constitutional grounds, nor is a consideration of the constitutionality of the statutory provisions necessary, because this court concludes that such statutory provisions do not require or authorize the elimination or withholding of statutory good time for failure to perform work which a prisoner is unable to do because of physical infirmity not occasioned by misconduct. Where a physician has declared the prisoner unfit to perform work, it can scarcely be argued that the prisoner has "duties" of work. The "faithful performance of duties" contemplated by § 83–1,107, for which statutory good time must be given, cannot reasonably be said so to include work which there is no duty to perform that failure to perform it authorizes withholding or elimination of such good time. Stated positively, it means that good behavior and faithful performance of those duties which a prisoner is assigned and is fit to perform result in the reduction of a sentence. Accordingly, I find that no constitutional issue regarding the statutory provisions arises and that the issue in the present cases is whether the policy promulgated by the warden, as Director of Corrections, is violative of the prisoners' constitutional rights.

■ The Fourteenth Amendment of the Constitution of the United States expressly forbids a state to "deny to any person within its jurisdiction the equal protection of the laws." When a state affords one person a right by statute, it must afford all persons the same right, Cochran v. Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942), at least in the absence of some exceptional circumstance based upon an interest possessed by the state in the class of persons constituting the exception. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L. Ed.2d 222 (1964); Harper v. Virginia Board of Education, 383 U.S. 663, 86

S.Ct. 1079, 16 L.Ed.2d 169 (1966). It is true that mere violation by a state official of a state statute does not infringe the federal constitution. Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944). But here there is more than a mere violation of the state statute granting statutory good time. The policy of denying statutory good time has the effect of requiring prisoners to choose between their statutory good time, on the one hand, and their constitutional right to receive necessary medical treatment, including relief from work, on the other. Requiring that choice by the disabled necessarily has a chilling effect upon procurement of the constitutional right to medical treatment. See United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

The interest of the State of Nebraska in requiring prisoners to work is determined in § 83–183 Nebraska R.R.S. 1943, as amended, as follows:

> "To establish good habits of work and responsibility, to foster vocational training, and to reduce the cost of operating the facilities, persons committed to the Division of Corrections shall be employed so far as possible in constructive and diversified activities in the production of goods, services and foodstuffs to maintain the facilities, for state use and for other purposes authorized by law."

That state interest is in no way promoted by the withholding of statutory good time for persons declared by the prison physician to be physically unable to work. If the physical disability has been caused by the prisoner's misconduct, some other state interest may be involved, but that circumstance is not present in the cases at bar.

I am compelled to declare that the policy of denying statutory good time to persons physically unable to perform work, when that physical inability does not result from misconduct on the part of the prisoner, is contrary to the equal protection clause of the Fourteenth Amendment of the Constitution of the United States and to enjoin the enforcement of the policy to that extent. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Meritorious good time, as opposed to "statutory good time" stands on a different footing. The granting of meritorious good time is permissive under the statute, rather than mandatory. There is nothing in the evidence to indicate a deliberate or purposeful discrimination against the petitioners with respect to meritorious good time. Indeed, there is no evidence as to what the practice is in awarding meritorious good time to persons who are not physically infirm. The mandatory nature of the statute with respect to statutory good time sets the standard; the permissive nature of the statute with respect to meritorious good time sets no standard, so evidence of the actual practice must provide guidelines and no such evidence was here presented. The burden in that respect being upon the petitioners, I hold that they have not carried their burden of showing impermissible discrimination in the granting of meritorious good time.

Orders consistent with this memorandum of decision will be entered today and this memorandum of decision will constitute the findings of fact and conclusions of law in these three cases.