NAKED CITY, INC., an Indiana Corporation, and Richard Drost, Individually and as President of Naked City, Inc., Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 3–282A23.

Court of Appeals of Indiana,
Third District.

Jan. 26, 1984.

Frederick F. Cohn, Chicago, Ill., G. Max Rettig, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen., George B. Huff, Jr., Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

Pursuant to guilty pleas, Richard Drost and Naked City, Inc. were convicted on several counts of "exhibition of an obscene performance" together with single counts of "offering to distribute obscene matters," "displaying matters harmful to minors," and "sponsoring an obscene performance depicting a person under the age of 16 years." *See* IC 35-30-10.1-1 et seq. All the charges except "sponsoring an obscene performance depicting a person under the age of 16 years" were misdemeanor charges. The latter charge is a Class D felony.

The evidentiary background discloses that Drost is the president, founder and guiding light of Naked City, Inc., a nudist camp. The camp consists of a restaurant, a central building and a series of cottages available for temporary rental or permanent residence. The main building contains a registration center, Drost's living quarters, an area where films are shown and a soft drink machine and pool table. Although the members of the camp are adults, patrons do bring their children to Naked City and at the time this controversy arose, a family including three children was permanently residing on the grounds.[1]

On August 7, 1980 Officer Barry Rutherford went to Naked City as an undercover investigator for the state police. Most of the charges above were based upon Officer Rutherford's experiences during his August 7, 1980 visit to Naked City. Rutherford attended a showing of sexually explicit films, including "The Dirty Western," "Little Girls Blue" and "Dear Pam." The films were shown in one area of the camp's main building. Although minors were not officially allowed to watch the films shown there, children could observe the progress of particular films as they passed through the building on their way to the soft-drink machine and pool table located in the rear. As Rutherford testified, "Minors came through the door of the entrance. Some would stop. None of them sat down and watched the film, per se, they passed in the area, they were in the area." Additionally, as a result of Rutherford's investigation, Indiana State Police officers armed with a search warrant seized 254 allegedly obscene films and videotapes.

The felony charge resulted from one incident Officer Rutherford witnessed. "The Dirty Western" was one of the films shown that day. When this film was shown to the audience, including Officer Rutherford, it included a 35 second Drost-made videotape of a fourteen year old girl. The girl was at Naked City with her parents' permission and her parents consented to the taping.

At a sentencing hearing held February 11, 1982 the state presented evidence that in 1975 Drost had been convicted of keeping a house of ill fame. In 1978 Drost and Naked City were enjoined from conducting a "Mr. and Ms. Nude Teenybopper Contest." The state also presented evidence that Drost had attempted to sexually exploit young women by fraudulent offers of employment at Naked City.

---

1. Naked City has two categories of membership: One is an annual membership. In return for a single, annual fee the member is given a card which opens the electronic gate allowing entry into Naked City. The second type of membership is a daily membership. Would-be patrons of the camp register at the central building and pay a daily fee. This fee is, generally, $5 per person, $10 per couple, and $15 for single men who arrive on "Friday, Saturday, Sundays and holidays."

Drost responded with evidence of mitigating factors. This evidence included letters attesting to Drost's good character and to the value of Naked City as a lifestyle. Drost introduced books and articles on the theory and practice of nudism. Several witnesses testified about their experiences at the camp and how they had found it rewarding. Perhaps most importantly, Drost introduced evidence of his fragile health. He is in the advanced stages of muscular dystrophy. Because he is unable to exercise, his bones have "demineralized" and are extremely subject to fracture. In addition, at the time of sentencing Drost had a non-healing displaced fracture of the left hip. Because Drost has no muscle function left in his shoulders, hips, arms and legs, he has to be turned every few hours. He is also very subject to infection. The thrust of Drost's evidence was to urge that he required such meticulous medical care that any form of incarceration could very well prove fatal to him.

In response to this evidence the state introduced the testimony of Samuel Molter, director of one of the complexes at the Westville Correctional Center. Molter described the medical facilities at Westville and indicated that 20 handicapped patients were in residence there. He testified that Westville had arrangements whereby patients in need of care beyond the capabilities of the center could be transferred to either Memorial Hospital in Michigan City or Wishard Hospital in Indianapolis. Because of his lack of medical expertise, Molter was not allowed to give his opinion as to whether Westville could properly care for a patient suffering from the advanced stages of muscular dystrophy. In addition as evidence that Drost's physical condition was not as calamitous as he indicated, the state introduced a videotape entitled "Dick and Jane." This was a videotape made at Naked City depicting Drost having sexual intercourse with a woman. Drost objected that the tape had been made at a time before he had broken his hip and before the degeneration of his muscular structure had progressed to its state at the sentencing date.

After all the evidence had been presented, the court entered sentences for the two defendants. Naked City was fined in varying amounts for each of the charges against it. No appeal has been taken concerning the punishments imposed upon Naked City. Drost was also fined for each of the misdemeanor charges, but received the following sentence for the felony count:

"On that Count the defendant is fined in the penal sum of $10,000. Further, the defendant is sentenced to two years incarceration at the Department of Corrections, Westville Center. Defendant is to commence service of that sentence on the 22nd day of February, 1982.... Westville Center Hospital Facility ... is ordered and directed to submit to this Court, before the 22nd day of February, 1982 a report as to whether or not the Indiana Department of Corrections can maintain the defendant without further injury to his health. If the Indiana Department of Corrections is unable to properly care for the defendant because of his physical infermities [sic] the defendant is then to be returned by the Department of Corrections to his place of residence. The defendant then shall be placed on formal probation for a period of 2 years."

Drost subsequently sought habeas corpus before the United States Court of Appeals for the Seventh Circuit and a stay of execution before the Indiana Supreme Court, but in each instance his petition was denied. This court granted a temporary stay of execution of his sentence pending appeal. Drost now brings this appeal seeking modification of his sentence. His principal contention is that a sentence of incarceration for one with his physical infirmities constitutes a cruel and unusual punishment violating the Eighth Amendment of the United States Constitution. In addition he asserts that he was denied due process when the court refused his request for an evidentiary hearing concerning his ability to spend two years in the Westville Correctional Center. He also asserts that the trial court erred in admitting certain evi-

dence at the sentencing hearing, that the prosecuting attorney failed to abide by a plea agreement, and that it was error to deny Drost's counsel an extension of time in which to file a memorandum of law in support of his already filed motion to correct errors. We consider these three latter points first.

## I.

Drost first contends that he was denied due process because the trial court admitted hearsay reports and a videotape at the sentencing hearing. The reports were from two police officers and recounted the experiences of young women with Drost and Naked City. Their tenor was that Drost offered sexual enticements to women to enter his employ and that nude dancing and pornographic movies were featured at Naked City. The videotape depicted Drost having intercourse, and was admitted only for its bearing on Drost's assertions concerning his physical condition. We find no error in the court's reception of these items, nor will we presume that a trial judge, learned in the law, is unable to properly weigh or discount the significance of various items of evidence.

■ We, of course, agree that a convicted person has the right to be sentenced upon the basis of accurate information and that a sentence based upon "materially untrue assumptions" violates due process. *Gardner v. State* (1979), 270 Ind. 627, 638, 388 N.E.2d 513, 520. On the other hand, the strict rules of evidence which apply at trial during the guilt finding process no longer govern at sentencing. *Williams v. New York* (1949), 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337; *Hineman v. State* (1973), 155 Ind.App. 293, 292 N.E.2d 618. *See also Lottie v. State* (1980), Ind., 406 N.E.2d 632. Drost was given ample opportunity to dispute the reports. There was no error in the court considering them.

The same holds true of the videotape. Drost asserts the tape was secured in violation of his Fourth and First Amendment rights. Drost makes no cogent argument as to how the state violated his rights under the First Amendment and we perceive none. Drost was not being prosecuted or punished either for making or possessing the film. It was offered in rebuttal to Drost's own videotape offering concerning his physical condition.

■ The more apparent claim is that the tape was seized through an improper search. The problem is that the claim ignores the fact that Drost pleaded guilty. Furthermore, there is no real contention that his plea was not knowingly, intelligently and voluntarily entered. Under such circumstances the law is clear that claims that evidence has been unlawfully obtained are waived by the admission of guilt. *Tollett v. Henderson* (1973), 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235. The rule has been applied to the introduction of such evidence at a sentencing hearing. *Mitchell v. Hopper* (S.D.Ga.1982), 538 F.Supp. 77, 100. We find no error in the court's consideration of the tape.

## II.

■ Drost next argues that the state failed to abide by its plea bargain to make no recommendation at sentencing. The record does not disclose that the state made a sentencing recommendation although the prosecuting attorney stated he was opposed to treating the felony as a misdemeanor. Assuming arguendo that his statement could be considered a recommendation, we find no error.

Indiana law is quite specific that in order to be binding, plea bargains must be in writing. IC 35–5–6–1 et seq., especially IC 35–5–6–2 [Repealed].[2] Here there is no contention that there was ever a writing and the state denies that there was any agreement at all. We find no merit to Drost's contention.

## III.

Drost argues that the court erred in denying his new counsel an extension of time

2. For the current version of the requirement see IC 35–35–3–1 et seq.

in which to file a memorandum of law in support of an already filed motion to correct errors. Again we find no error.

■■■ Drost was sentenced on February 11, 1982. Thus, his motion to correct errors was due no later than April 12, 1982. Under Indiana law the motion could be amended or supplemented until that date, but not thereafter. *Fancher v. State* (1982), Ind., 436 N.E.2d 311; *Junigan v. State* (1982), Ind.App., 443 N.E.2d 325; *VerHulst v. Hoffman* (1972), 153 Ind.App. 64, 286 N.E.2d 214. The rule has been applied in a situation where an issue was attempted to be added by a "brief" subsequently filed in support of a motion to correct errors. *Kroll v. Bell* (1982), Ind. App., 433 N.E.2d 71.

Post Conviction Remedy Rule 2 does, of course, permit the filing of a belated motion to correct errors in criminal cases where no timely and adequate motion to correct errors was filed for the defendant; the failure was not due to the defendant's fault; and the defendant is diligent in requesting permission to file a belated motion. Our Supreme Court has interpreted this rule to not permit the belated adding of additional grounds of error which were merely omitted from an otherwise timely, properly filed motion to correct errors. *Adams v. State* (1979), 270 Ind. 406, 386 N.E.2d 657.

In the present instance Drost's appellate counsel filed a motion to correct errors on February 16, 1982. The motion recited that Drost was then being represented by Carolyn Jaffe (trial counsel), Frederick F. Cohn and Max Rettig (appellate counsel). Thereafter on March 15, 1982, Mr. Cohn filed a motion requesting an extension of time to file a memorandum of law in support of the motion to correct errors. The trial court granted this request and subsequently a second request extending the time to April 14, 1983. On April 15 Cohn requested a third extension asserting the

unavailability of a transcript or the recording of the sentencing hearing. This request was denied by the court in an entry which noted that the recording of the proceedings had been available for counsel to listen to at all times since the filing of the motion to correct errors. We note additionally that while Drost's argument on appeal asserts it was error for the court to deny a further continuance there is no contention advanced that Drost was thereby precluded from presenting any ground for error either to the trial court or this court.

■■■ If Drost's motion was indeed addressed merely to a memorandum of law in support of his motion he has failed to demonstrate either an abuse of discretion by the trial court in refusing a third time extension, or how he was harmed since there is no contention he was prohibited from claiming a ground for relief. Appellate Rule 8.3(A)(7).

If the motion actually sought to extend the time for filing a supplemental motion to correct errors, there was no error in denying it. Criminal Rule 11; *Fancher, supra.*

■■■ We do not believe the motion was properly to be construed as a petition pursuant to Post Conviction Remedy Rule 2. To the extent that it could be so considered, no reversible error is shown since there is no allegation that no timely and adequate motion to correct errors had been filed [PC 2, Section 1], and there is no contention that Drost has been precluded from asserting any specific claim of error.

The court did not err in denying the continuance.

### IV.

■■■ We come now to what we deem the essential contentions of Drost's appeal. Drost argues that his sentence of two years' incarceration is so cruel and unusual as to violate the Eighth Amendment to the United States Constitution.[3] He bases his

---

**3.** "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONSTITUTION, Amend. VIII. The amendment is binding on the states. *Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758. The Indiana Constitution contains a similar provision: "Excessive bail shall not be required. Excessive

argument upon two distinct contentions: (1) The sentence is grossly disproportionate to the "acts which form the basis of the charges" and to Drost's "prior criminal background." (2) The sentence is cruel because Drost's poor health make it more than likely that incarceration will cause his death.

▆▆▆ The history of the prohibition against "cruel and unusual" punishments is traced in *Furman v. Georgia* (1972), 408 U.S. 238, 316–334, 92 S.Ct. 2726, 2765–2775, 33 L.Ed.2d 346 (Marshall, J. concurring). The phrase first appeared in the English Bill of Rights of 1689, and was directed at the ghastly punishments then in vogue. *Id.* at 317, 92 S.Ct. at 2766. The English provision was included, verbatim, in the American Bill of Rights, apparently for the same reasons. The Supreme Court has been called upon to interpret the prohibition on many occasions. The Court has held that the provision is not a "static" one, but must be interpreted in light of "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630. The prohibition has been interpreted to bar "cruel" punishments and to bar "excessive" punishments. 408 U.S. at 330–31, 92 S.Ct. at 2772–73. "Cruel" punishments are those which "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia* (1976), 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859. A punishment cannot "be so totally without penological justification that it results in the gratuitous infliction of suffering." 428 U.S. at 183, 96 S.Ct. at 2929; *Rhodes v. Chapman* (1981), 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59.

▆▆ Nor can a punishment be excessive. "Excessive" punishments are those "which by their ... length or severity are greatly disproportioned to the offenses charged." *O'Neil v. Vermont* (1892), 144 U.S. 323, 339–40, 12 S.Ct. 693, 699, 36 L.Ed.

450 (Field, J., dissenting). The excessive standard was adopted in *Weems v. United States* (1910), 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. The Court employed the standard to find the Philippine *cadena temporal*, requiring imprisonment in chains for fifteen years, a loss of civil rights and lifetime surveillance to be cruel and unusual punishment for falsifying a government document. The Court examined the punishment in relation to the offense, compared it to punishments for other crimes and to punishments for the same crime in other jurisdictions, and found it excessive. 217 U.S. at 381, 30 S.Ct. at 554. A similar analysis has been employed in other cases in which a punishment has been challenged as excessive. *Louisiana ex rel. Francis v. Resweber* (1947), 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422; *Trop v. Dulles* (1958), 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630.

▆▆ Drost argues that his sentence is both cruel and excessive. However, when the latter argument is dissected it becomes apparent that it is not an argument on excess within the meaning of *Weems*. Drost does not argue that a two-year prison term is a disproportionate penalty for committing a Class D felony under IC 35–30–10.1–3. Rather, he argues that such a prison term is a disproportionate penalty for Richard Drost, who was convicted of a Class D felony under IC 35–30–10.1–3. He contends that the penalty is disproportionate because the effects which incarceration would have upon his health, and survival, are incommensurate with the offense, and the circumstances surrounding it. The argument reduces to the contention that imprisonment would inflict unnecessary pain and suffering because of Drost's physical peculiarities. A punishment which inflicts unnecessary pain and suffering is a "cruel" punishment. 428 U.S. at 173, 183, 96 S.Ct. at 2925, 2929. We conclude, therefore, that Drost has really advanced only one argument, that imprisonment is for him an

fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penal-

ties shall be proportioned to the nature of the offense." IND. CONST. Art. 1, Section 16.

unconstitutionally cruel punishment.[4] The merit of the argument depends upon whether a failure to provide medical care of given quality qualifies as cruel punishment under the Eighth Amendment.

The Supreme Court considered the relationship between medical care and the Eighth Amendment in *Estelle v. Gamble* (1976), 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. Gamble, an inmate of the Texas prison system, filed a complaint charging the Texas Department of Corrections with refusing to provide him with adequate medical care, thereby subjecting him to cruel and unusual punishment under the Eighth Amendment. In analyzing Gamble's claim, the Court employed the analysis above as to what constitutes a "cruel" punishment. *Id.* at 102–03, 97 S.Ct. at 290. The Court noted that the Eighth Amendment "proscribes more than physically barbarous punishments." It embodies " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' . . . against which we must evaluate penal measures." *Id.* at 102, 97 S.Ct. at 290. The Court concluded that

> "[t]hese elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or lingering death,' . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, deni-

al of medical care may result in pain and suffering which no one suggests would serve any penological purpose. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency."

429 U.S. at 103, 97 S.Ct. at 290 (citations omitted).

The Court held that "deliberate indifference to the serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291. The Court was careful to point out, however, that neither "an inadvertent failure to provide adequate medical care" nor negligence in diagnosing or treating a medical condition rise to the level of cruel and unusual punishment under the Amendment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 105–06, 97 S.Ct. at 291–92. The Court went on to dismiss Gamble's complaint. Gamble had alleged that the treatment he had received for a back injury was so egregiously inadequate as to violate the amendment's prohibitions. The Court found that the treatment he had received, including seventeen appointments with physicians in three months, was not so inadequate as to rise to the level of a constitutionally cognizable deprivation.

In *Estelle* the Supreme Court adopted as a standard the "deliberate indifference" standard first articulated by the Second Circuit. *Martinez v. Mancusi* (2d Cir. 1970), 443 F.2d 921, 924, *cert. denied* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335

---

**4.** The categories are not perfectly discrete. A punishment may well be "excessive" because of the physical pain it entails, and an excessive punishment may be "cruel" if it involves the infliction of physical pain. The Supreme Court appears to have employed the "excessive" standard for punishments which, although they may not involve physical pain, do involve deprivations incompatible with the nature of the offense. In *Trop v. Dulles, supra,* for example, the Court held that loss of citizenship was an excessive punishment for wartime desertion. 356 U.S. at 100–01, 78 S.Ct. at 597–98. "Cruel" punishments are those involving "torture or a lingering death." *In re Kemmler* (1890), 136 U.S.

436, 10 S.Ct. 930, 34 L.Ed. 519. Challenges employing this standard have usually been directed against methods of execution. *Wilkerson v. Utah* (1879), 99 U.S. 130, 25 L.Ed. 345 (death by shooting not unnecessarily cruel); *Louisiana ex rel. Francis v. Resweber* (1947), 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (second execution by electrocution after first attempt failed not unnecessarily cruel). Because Drost's argument is not directed at the relationship between the penalty and the offense as compared with other penalties for the same offense, it is not an argument on excess. It is an argument on cruelty because it is directed at the gratuitous infliction of pain and suffering.

(1971). The standard was one of several developed to deal with prisoner challenges to institutional medical care. *Mayfield v. Craven* (9th Cir.1970), 433 F.2d 873, 874 ("barbarous act"); *Cates v. Ciccone* (8th Cir.1970), 422 F.2d 926, 928 ("obvious neglect"); *Gittlemacker v Prasse* (3d Cir. 1970), 428 F.2d 1, 6 ("intolerable to fundamental fairness"). The problem which the courts have faced is apparent in *Estelle.* The concern has been to allow challenges to denials of medical care without "creating a constitutional tort of malpractice that would raise beyond tolerable levels the already heavy burden ... of ... prisoner litigation." Neisser, *The Search for Constitutional Standards for Prison Health Care,* 63 VIRGINIA LAW REVIEW 921, 922 (1977). It is this concern which is responsible for the courts' refusal to consider the adequacy of medical care provided. Contentions of inadequate treatment have been considered as malpractice claims, rather than constitutional violations. 63 VIRGINIA LAW REVIEW at 934–36; *Coppinger v. Townsend* (10th Cir.1968), 398 F.2d 392, 394.

*Estelle* has provided the basis for a series of prisoner challenges to prison conditions. In *Rhodes v. Chapman* (1981), 452 U.S. 337, 346–47, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59, the Supreme Court held that "the conditions of confinement" can themselves inflict cruel and unusual punishment. "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." 452 U.S. at 347, 101 S.Ct. at 2399. Because lack of access to medical care can result in "the wanton and unnecessary infliction of pain," it has provided the rationale for a series of class actions by inmates challenging institutional conditions. *Hendrix v. Faulkner* (N.D.Ind. 1981), 525 F.Supp. 435, 473–521; *Todaro v. Ward* (S.D.N.Y.1977), 431 F.Supp. 1129, 1133, *aff'd.* 565 F.2d 48 (2d Cir.1977); *Ruiz v. Estelle* (S.D.Tex.1980), 503 F.Supp. 1265, 1307–30; *Lightfoot v. Walker* (S.D.Ill. 1980), 486 F.Supp. 504. These collective challenges have established that "systemic deficiencies in the delivery of medical care which make unnecessary suffering inevitable" constitute cruel and unusual punishment. 525 F.Supp. at 510.

Individual inmates have followed *Gamble* in challenging the treatment they have received at the hands of prison medical staffs. *Byrd v. Wilson* (6th Cir.1983), 701 F.2d 592; *Hurst v. Phelps* (5th Cir.1978), 579 F.2d 940; *West v. Keve* (3d Cir.1978), 571 F.2d 158; *Miller v. Carson* (M.D.Fla. 1975), 401 F.Supp. 835, 848. From these cases a standard for ascertaining the presence of deliberate indifference to prisoners' medical needs has emerged. "[T]o prove an individual claim of unconstitutional denial of medical care it is necessary to show either denial or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment." 525 F.Supp. at 520, citing *Todaro v. Ward, supra,* 431 F.Supp. at 1132–33. Deliberate indifference was found in *Maclin v. Freake* (7th Cir.1981), 650 F.2d 885. *Maclin* was a challenge brought by an inmate at the Indiana State Prison. Maclin, a paraplegic confined to a wheelchair, filed a complaint alleging cruel and unusual punishment as the result of the prison's deliberate indifference to his serious medical needs. Maclin alleged that he had been denied the medication previously prescribed for the pain he constantly suffered. He also contended that he had asked for physical therapy upon his arrival at the institution, and for some time thereafter. His requests were met with the often-repeated statement that he would receive therapy when the necessary equipment arrived at the prison. Because he did not receive therapy, his legs locked into position and he lost the ability, which he possessed upon arriving at the prison, to move them. The District Court for the Northern District of Indiana dismissed the complaint, but the Seventh Circuit reversed and remanded. The Court of Appeals found that Maclin had presented a "colorable claim" because the lack of physical therapy, with its attendant effects, constituted " 'deliberate in-

difference to [his] serious medical needs.' " 650 F.2d at 889, citing *Estelle v. Gamble.*

Two pre-*Estelle* cases address medical care necessary for survival itself. In *McCollum v. Mayfield* (N.D.Cal.1955), 130 F.Supp. 112, a prisoner was injured, denied medical care, and as a result became "permanently paralyzed and disabled." In ruling against the defendant's motion to dismiss, the court commented: "A refusal to furnish medical care when it is clearly necessary ... could well result in the deprivation of life itself; ... plaintiff suffered paralysis and disability from which he will never recover. This amounts to the infliction of permanent injuries." 130 F.Supp. at 115.

*Sawyer v. Sigler* (D.Neb.1970), 320 F.Supp. 690, was a challenge brought by three inmates of the state prison, all alleging deprivations of medical care. One inmate, Lyle H. Bartholomew, had been diagnosed as having possible systemic cancer after undergoing several operations for removal of particular cancers. During two years of incarceration, Bartholomew was provided no treatment within the prison and no arrangements were made for treatments in an outside hospital. This occurred despite the fact that Bartholomew displayed serious physical symptoms, including unexplained bleeding from various portions of his anatomy. The court held that the "proper standard of adequate medical treatment has not been accorded" and entered an order directing the prison warden to provide Bartholomew with examinations by cancer specialists, all necessary tests and treatment as indicated. 320 F.Supp. at 695.

From the decided cases we draw the following conclusions. Prisoners of the state are entitled to reasonable medical care. However, challenges to the mere adequacy of individual care or claims of medical malpractice are not of constitutional dimension. In addition, such challenges will normally have to be raised through a different procedure than that presently employed by Drost. *See Stader v. State* (1983), Ind.App., 453 N.E.2d 1032; *Jefferson v. State* (1980), Ind.App., 399 N.E.2d 816.

Yet where reasonable medical care is denied deliberately, and such denial results in the infliction of unnecessary pain, suffering or disability both the Eighth Amendment of the Constitution of the United States and Article 1, Section 16 of the Indiana Constitution are implicated. The deliberateness necessary may exist from a showing of deliberate indifference to the consequences of denying or delaying care, and this determination must be made as a question of fact. "Deliberate indifference" in this constitutional sense may thus be found where reasonable care is denied or unreasonably delayed with the knowledge that such denial/delay will cause the unnecessary infliction of pain and suffering which serves no penological purpose *and* when the care is intentionally or wantonly withheld.

Drost established at the sentencing hearing his apparent need for extraordinary medical care and the life-threatening consequences of its denial or delay. We conclude that his claim thus sufficiently implicated his constitutional guarantees to be cognizable at that time. *Compare Stader, supra; Jefferson, supra.*

His evidence, subsequently confirmed in large part by examining staff physicians at Westville, disclosed that due to his advanced stage of muscular dystrophy Drost would require around-the-clock nursing care. He should be rotated approximately every two hours, which would have to be carefully done because of his severe osteoporosis. He would require hand feeding, daily bathing and skin care, oral care including having his teeth brushed, and assistance with urination and bowel movements. In addition his physical condition requires an appropriate environmental atmosphere since he is prone to develop pulmonary complications.

At the sentencing hearing Samuel Molter, director of one of the complexes at Westville, described the medical facilities at Westville and the availability of hospital

facilities at Memorial Hospital in Michigan City and Wishard Hospital in Indianapolis. Because of his lack of medical expertise he was not permitted to give an opinion as to whether Westville could care for a muscular dystrophic patient.

Drost was then sentenced by the court. He was fined and ordered to serve two years' incarceration at the Department of Corrections, Westville Center, if the Center could properly care for him; otherwise he was to be placed on formal probation for two years. The Center was then directed to examine Drost and report back to the court whether it could properly care for him. Subsequently, Westville filed its report which consisted of a letter from the Superintendent of the Center accompanied by reports from the nursing and medical staff. The superintendent's report was positive. It asserted the state could properly maintain Drost either at Westville or some other facility under contract to the department. The nursing and physicians' reports were much less conclusive. The nursing report concluded that present staff could not provide minimal basic care for Drost and that an additional six special attendant positions would be needed to provide for his care. As previously indicated the two physicians who reported detailed Drost's needs. They concluded that "only if the facility can guarantee to meet the above specific needs can we as physicians feel that this individual can be cared for adequately at the Westville Correctional Center."

██ We believe that the trial court in the absence of established procedure was endeavoring to protect both the rights of Drost and those of the people and was sensitive to the issue involved. We nevertheless conclude that the judge was in error in his method of procedure and believe the results at hand demonstrate why.

The problem is that the law requires that the trial judge shall impose sentence. IC 35-50-1-1 states:

"The court shall fix the penalty of and sentence a person convicted of an offense."

Thus, it must be the trial judge, rather than the employees at Westville, who determines whether the defendant is to be incarcerated or given probation.

██ In the instant case we cast no aspersions at either the medical or administrative personnel at Westville. Yet it is natural for an administrator to assert that his administration can "do the job," and it is natural for medical professionals to be cautious or concerned about assuming extraordinary health care risks at these institutions. Our point is that under such circumstances it must be the function of the judge to hear and weigh the evidence, balancing the rights of the state and the accused, and determine the appropriate sentence. We may then on appeal review his determination in the light of the evidence and the applicable law.

Accordingly, we reverse the sentence imposed and remand to the trial court for such further hearing as may be necessary and for resentencing. In all other respects the convictions are affirmed.

STATON, J., and CONOVER, P.J. (sitting by designation), concur.