Larry Lee PHELPS, Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1–283A49.

Court of Appeals of Indiana,
First District.

Sept. 13, 1983.

Roy L. Dickinson, Franklin, for defendant-appellant.

Linley E. Pearson, Atty. Gen. of Ind., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Larry Lee Phelps (Phelps), was convicted by a Johnson Circuit Court jury of involuntary manslaughter under Ind.Code 35–42–1–4, in that he did "kill Angela Cheryl Davis, a human being, while committing the crime of battery, to-wit: did kill said Angela Cheryl Davis, by shaking or striking said Angela Cheryl Davis about the face and head in an angry manner". Phelps appeals from this conviction.

We affirm.

## STATEMENT OF THE FACTS

At 6:35 a.m. on November 22, 1981, police officers were called to the mobile home residence of Phelps and Kimberly J. Davis at the Wheel Estate Mobile Home Park in Johnson County pursuant to a reported child death. They discovered 14 month old Angela Cheryl Davis in her crib, dead. The autopsy conducted that day at 10:00 a.m. by Dr. Harley P. Palmer disclosed multiple bruises all over the child's body. All of the bruises, except those from the knees down, were of recent origin; not less than four to six hours old, and not more than 24 hours

old. The bruises were located as follows: on each elbow; nine or ten on the back at the level of the beltline; five on the hip; one on the chest; four elongated bruises on the left jaw, similar to a hand print; four on the right jaw; one on the right cheek; one on the inside of the mouth between the lip and the front teeth, with traces of blood; three on the right side of the forehead, and a scraping or abrasion on the tip of the nose. All of the bruises were round except those on the left jaw. Brain damage found on the right side of the brain consisted of bruising and subdural hemorrhage. A general swelling of the brain, described as cerebral edema, was the cause of death. Dr. Palmer stated that at the time of the autopsy the child had been dead at least six hours, perhaps longer. He stated there is no scientific way to pinpoint the exact time of death, however, the coroner fixed the time at 12:15 a.m. on November 22, 1981. Blunt force applied to the outside of the skull was listed as the cause of the child's head injuries and subsequent death. Brain damage, not the bruises on the body led to the death. There were no puncture marks or fractures.

Kimberly J. Davis (Kimberly) was the mother of the child. Phelps was Kimberly's live-in boyfriend, and was characterized by one investigating officer as borderline retarded.

Phelps told investigating officers that only he and Kimberly had any contact with the child the day of November 21. Phelps had been there the entire day and night without leaving. However, it was necessary for Kimberly, as usual in her employment, to go to the restaurant where she worked and check out the cash register at 11:00 p.m. Phelps stayed home with the child, who had been upset and had cried quite a bit before falling asleep on a security blanket on the floor.

Phelps told officers that he put the child to bed, covered her, and gave her a bottle of orange juice at about midnight. At that time she was breathing and seemed normal. After putting the child to bed, he said that he took the portable T.V. set to the bed-

room and fell asleep. It was "his belief" that Kimberly came home at 12:15 or 12:30 a.m. on November 22. Kimberly affirmed this. He woke up the next morning upon hearing Kimberly screaming that her child was dead. An emergency medical technician who was among the first to arrive at the scene said that the child was battered. Phelps claimed that he was not aware of the bruises until after the child's death, and later in accounting for the bruises both he and Kimberly stated the child (1) was awkward and fell often; (2) fell onto a fiberglass milk crate or carton three or four days before; and (3) bumped a table leg at the restaurant the previous week. Phelps also stated that he thought the child had fallen in the bathroom the night before its death. However, both Phelps and Kimberly stated that on these occasions the child was not apparently harmed and scarcely cried. No characteristic of the milk carton corresponded with the bruises found on the child.

Omitted from his recitation of the events of November 21 was the fact that Phelps, between 11:00 p.m. and 12:00 a.m., went to a neighbor's trailer, Overbys', and asked to use the phone. Overbys stated his eyes were glassy and his speech was funny and blurry. They told Phelps they did not have a phone and he left. Phelps repeated his request at the Elliotts' trailer between 11:00 p.m. and 11:30 p.m., but they did not have a phone either. At the Elliotts, Phelps seemed nervous and in a hurry.

The next morning between 3:00 a.m. and 5:00 a.m., the Overbys heard Kimberly pounding on their door, saying she thought her baby was dead and wanted to use their phone. The Overbys stated that she did not appear to have just gotten out of bed; her hair was neat, she was fully clothed and wearing make-up. The Overbys offered to call the police and an ambulance for her from a pay telephone, however, they could not get their car started. Kimberly then went to a pay phone herself, and was followed by Mrs. Overby.

Dr. Palmer testified it was impossible to cause the number of bruises, with their varied locations, from falling on a milk carton. He totally discounted the assertion that the child's injuries and death were caused by the assorted mishaps assigned by Phelps and Kimberly. He defined a battered child as a child exhibiting multiple injuries which were inconsistent with the history given. Here the history provided by Kimberly and Phelps was inconsistent with the child's many injuries, leading to the conclusion that the child was a battered child.

## ISSUES

Phelps raises three issues which, when condensed, are:

I. Whether the evidence presented at trial was sufficient to sustain a conviction, such evidence being wholly circumstantial in nature.

II. Whether a subsequent plea of guilty to a lesser crime made by one charged with a crime identical to that for which the defendant was convicted, constitutes newly discovered evidence necessitating a new trial.

## DISCUSSION AND DECISION

*Issue I.*

In reviewing an allegation that a jury verdict is not sustained by the evidence, and is therefore contrary to law, this court will neither reweigh the evidence nor judge the credibility of the witnesses. We shall only consider that evidence which is most favorable to the state, along with all reasonable and logical inferences to be drawn therefrom. If there is substantial evidence of probative value from which the jury could have inferred guilt, the conviction will stand. A verdict on which reasonable men might differ will not be set aside. It is only where no reasonable man could find that the evidence presented proves the accused guilty beyond a reasonable doubt that a verdict is not sustained by sufficient evidence. *Rowan v. State,* (1982) Ind., 431 N.E.2d 805; *Covington v. State,* (1975) 262 Ind. 636, 322 N.E.2d 705; *Hutchinson v. State,* (1967) 248 Ind. 226, 225 N.E.2d 828.

It is well established that a guilty verdict may be sustained on wholly circumstantial evidence. *Rowan, supra.* Both the *corpus delecti* and the defendant's connection with the crime may be proven by circumstantial evidence. *White v. State,* (1941) 219 Ind. 290, 37 N.E.2d 937. When the evidence presented is circumstantial in nature, it is only necessary that an inference reasonably tending to support a finding of guilt can be drawn from the evidence presented. *McCraney v. State,* (1983) Ind., 447 N.E.2d 589; *Pinkston v. State,* (1982) Ind., 436 N.E.2d 306.

In the present case, the evidence most favorable to the State reveals that a fourteen month old child died at approximately midnight on November 21, 1981. The child's death was traumatic, rather than natural, having resulted from brain damage caused by blunt force violently applied about the child's head. The child's body was covered with bruises. The highest concentration of these, which were located on the face and head, had been inflicted within hours of the child's death. Phelps had exclusive custody of the child during the hour or so immediately prior to the death and the better part of that entire day. However, he could not explain the numerous recent bruises appearing about the child's head. The account that Phelps did give was wholly unsatisfactory, leading the pathologist who had performed the autopsy to classify the child as battered. This evidence, although it is circumstantial, is sufficient to support an involuntary manslaughter conviction. *See Hutchinson, supra; Mobley v. State,* (1949) 227 Ind. 335, 85 N.E.2d 489. This is so even without direct testimony proving the means causing the death of the child. The means and manner of death may be inferred from the proven circumstances. *People v. Kinzell,* (1969) 106 Ill.App.2d 349, 245 N.E.2d 319. The jury could reasonably have inferred that Phelps administered the blows to the child's head which caused the brain damage and resultant death. The number and variety of bruises discredited any accidental means. Although Kimberly also had access to the child the day before the death occurred, the jury could reasonably have believed that the injuries were inflicted while she was gone from the house. *See generally Kinzell, supra.* Testimony evincing the reactions, statements, and demeanor of both Phelps and Kimberly following their discovery of the child's death was properly before the jury for their consideration. We will not judge the credibility of this testimony, nor reweigh the inferences gathered therefrom. *Stroud v. State,* (1983) Ind., 450 N.E.2d 992; *Mobley, supra.*

It is true that mere opportunity to commit a criminal act, standing alone, provides no proof that the defendant committed the criminal act. However, opportunity, or presence at the scene of the crime, may be sufficient to support a finding of guilt when coupled with other circumstances. *Manna v. State,* (1982) Ind., 440 N.E.2d 473; *State v. Pennewell,* (1979) 23 Wash. App. 777, 598 P.2d 748. The court in *Pennewell* held that because the defendant had control over the victim, his 27-month old son, at all critical times and gave two explanations of accidental injury, neither of which were medically feasible as the cause of death, the jury could logically have inferred that the defendant was guilty of manslaughter.

There are no Indiana cases directly on point, however, perlustration of *State v. Green,* (1970) 2 Wash.App. 57, 466 P.2d 193, a bench trial, does provide guidance and support for our decision here. In *Green,* a manslaughter conviction was upheld against a live-in boyfriend for causing the death of his girlfriend's two-year-old daughter. The defendant was not the father of the victim. The evidence, restated sequentially, disclosed that the defendant, the mother, and the victim spent the entire day of September 23 at home. The mother went out, leaving the victim at home with the defendant at approximately 7:00 p.m. The defendant testified that he put the victim to bed and then watched television until the mother, who was a prostitute, returned home with a customer at approximately 10:00 p.m. At this time the defend-

ant moved the victim to a back bedroom. When the mother and her customer had gone, the defendant returned the victim to the first bedroom, then left the house himself. There was conflicting evidence as to whether the defendant returned after only a few minutes or remained away from the house for several hours. The mother returned at approximately 1:45 a.m. and remained awake talking to the defendant until 5:00 a.m. The mother discovered the victim's death at 9:00 a.m. on September 24. Death resulted from internal injuries caused by a forceful blunt impact to the abdominal area. Multiple bruises were found elsewhere on the victim's body. The trial court found that death occurred between 9:00 p.m., September 23, and 9:00 a.m., September 24, and that the fatal blow was most likely struck between 9:00 p.m. and 2:00 a.m.. The death was not caused by an accidental fall, as was suggested by the defendant and the mother. No third party was implicated. Thus, either the defendant, or the mother, or both inflicted the victim's injuries and the fatal abdominal blow. No evidence of past violence by the defendant was introduced, however, the trial court found him guilty and the appellate court affirmed his conviction.

In the present case the jury was faced with the same choices as the trial court in *Green, supra,* since accidental causes were ruled out; was the fatal blow to the child's head struck by Phelps, or by Kimberly, or by both of them? Through the testimony of various neighbors, investigating officers and a deputy coroner, the jury discovered that Phelps had not given an accurate account of his activities on the night of the child's death, he had misrepresented himself as the child's father, and had given bogus excuses for the child's various injuries. The trial court in *Green, supra,* emphasized the inconsistencies in the stories given by the defendant, the improbability of some of them and the impossibility of corroborating or rebutting others. There is no one to corroborate Phelps account of the events which occurred inside the trailer he shared with Kimberly and her child during the hours while Kimberly was at work. Phelps'

explanation of the child's bruises was highly improbable and inadequate as to the cause of death. In *Green, supra,* the defendant and the mother insisted the victim was fine when the mother left home and upon her return later that night, however, the victim was inexplicably found dead in its bed the next morning. Phelps and Kimberly gave an identical account to the deputy coroner and the investigators in the present case. Just as the trial court's decision and conviction in *Green, supra,* was held to be logically support by sufficient evidence, so is the jury's verdict here.

*Issue II.*

 Both Phelps and Kimberly were charged with involuntary manslaughter in connection with the death of the child. Subsequent to the sentencing of Phelps, Kimberly pleaded guilty to the lesser included offense of neglect of a dependent child. Phelps argues this constitutes newly discovered evidence which entitles him to a new trial, because the jury could reasonably have inferred that he was not guilty of involuntary manslaughter had they been informed of Kimberly's plea. The decision to grant or deny a new trial is within the trial court's discretion. This court will not disturb the denial of a new trial based on newly discovered evidence unless there is a clear abuse of the trial court's discretion. *Williams v. State,* (1979) Ind.App., 392 N.E.2d 817. There was no abuse of discretion in this case. Evidence of a conviction or guilty plea, to either the charged offense or a lesser included offense, of others charged with the same offense as the defendant, is not substantive evidence of the defendant's guilt or innocence. *Jefferson v. State,* (1980) Ind.App., 399 N.E.2d 816; *Zarnik v. State,* (1977) 172 Ind.App. 593, 361 N.E.2d 202. Kimberly's plea of guilty to a lesser offense was irrelevant to Phelps' conviction and would have been inadmissible as evidence in his trial.

For the above stated reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON, P.J., and RATLIFF, J., concur.