**Sheila D. HUGHES,
Defendant-Appellant,**

**v.**

**STATE of Indiana, Plaintiff-Appellee.**

**No. 10A01–8605–CR–116.**

Court of Appeals of Indiana,
First District.

June 8, 1987.

Rehearing Denied July 29, 1987.

Susan K. Carpenter, Public Defender, C.H. Gardner, Deputy Public Defender, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Sheila D. Hughes (Hughes), appeals her convictions by a Clark Superior Court jury of neglect of a dependent child under Count I, battery under Count II, and involuntary manslaughter under Count III. Hughes was sentenced to a four-year term of imprisonment on Count I, and eight-year terms on Counts II and III. The sentences on Counts I and III were to be served consecutively, and the sentences on Counts II and III were to be served concurrently, resulting in a total sentence of twelve years.

We affirm and remand with instructions.

## STATEMENT OF THE FACTS

In December 1981, Hughes and her husband Tony received the victim, John Hughes, into their home. Several months later they adopted John, who had been born to Tony's sister. During the following year, several people observed a succession of injuries on John. In May of 1982, a neighbor, Juanita Neal heard John screaming; Hughes explained to her afterwards that she "had beat his little ass" because he had soiled his bed. *Record* at 1705. At the time, John was less than a year old. Also in May, two of Hughes's fellow church members, Joyce Martin and Tamera Coy, saw Hughes administer what Martin termed a "severe spanking" to John in church. *Record* at 1737. During the summer of 1982, fellow church member Rodger Coy saw several bruises on John's buttocks through a fold in his diaper. On several other occasions Coy noticed bruises on John's face and once Coy saw that John had, on the back of his head, a soft lump that appeared to contain fluid. Lita Miller, a close friend of Hughes who saw her and John nearly every day from June to October in 1982, observed bruises on John almost continually during this period. The last time Miller saw John, in October 1982, his left arm was in a makeshift sling and he had a "necklace" of bruises around his neck. *Record* at 1761. When Miller asked Hughes why she had not obtained medical treatment for John's arm, which had swollen to twice its normal size, Hughes replied that she prayed for John and "God would heal him." *Record* at 1762. Concerned, Miller related the situation to her doctor, who contacted the welfare department. Although the welfare department investigated the allegations of abuse and neglect, no charges were filed. Juanita Neal observed that John usually had bruises on his face because, during meals, Hughes would hold and work John's jaw up and down in an effort to get him to "chew right." *Record* at 1709. Neal also noticed the imprint of what appeared to be a soap dish on John's buttocks. The various injuries described were also noticed by others who had the opportunity to see John.

On March 29, 1983, Tony Hughes took John to the emergency room of the North Clark Community Hospital. Tony told the nurse there that John had fallen from his crib and struck his head. John's left eye

was fixed and dilated, his color was ashen, and his breathing was rapid and labored, indicating a brain hemorrhage. In the process of treating John, both the nurse, Paula Reekstein, and the physician, Dr. Ibrahim, noticed several bruises in various stages of healing. Given John's serious condition, he was flown by helicopter to Children's Hospital in Louisville, Kentucky. The emergency-room physician there, Dr. Sandra Johnson, also observed the bruises on John, and noted that they were not located on bony promontories, such as the elbows or forehead, but were in areas of soft tissue, which indicated that they were inflicted by another individual, and not the result of John's bumping into an object. From the emergency room, John underwent surgery to remove the blood clot from his brain. He was then taken to the intensive care unit, where he was treated by Dr. John Algren, who observed the bruises and who later testified that the severity of John's injury was not consistent with a fall from a crib. This opinion was shared by Dr. Henry Garretson, who performed the surgery, and Dr. Penelope Terhune, who treated John in the intensive care unit. John remained comatose and on a life-support system until April 2, 1983, when it was determined that he was brain dead. An autopsy performed by Dr. Alvin Martin revealed that the cause of John's death was the blow to his head. Also, the absence of a corresponding bruise on the side of his brain opposite the blood clot suggested that John's body was not moving at the time of impact.

Because of the death of John, on April 26, 1983, Hughes was charged by Information in Clark Superior Court with neglect of a dependent child, a Class D felony under IND.CODE 35–46–1–4(a)(1), battery, a Class C felony under IND.CODE 35–42–2–1(3), and involuntary manslaughter, a Class C felony under IND.CODE 35–42–1–4. After two continuances granted to the State over Hughes's objections, trial dates of November 29 and December 13, 1983, were set. Because of the State's failure to comply with two discovery orders, the Clark Superior Court entered an order on November 15, 1983, excluding certain State's evi-

dence. Then, on November 18, 1983, the State filed a motion to dismiss the charges on the basis that it had filed the same charges in the Clark Circuit Court. Hughes objected to the dismissal and filed a motion for sanctions, alleging prosecutorial misconduct. On November 28, 1983, the Clark Superior Court granted the State's motion to dismiss and found it no longer had jurisdiction over Hughes's motion for sanctions. Hughes then perfected an interlocutory appeal, which was unsuccessful. *See Hughes v. State* (1985), Ind. App., 473 N.E.2d 630, *trans. denied.* Also on November 28, 1983, the Clark Circuit Court held Hughes's initial hearing, set January 29, 1984 as the omnibus date, and scheduled Hughes's trial for February 21, 1984. Hughes's oral motion to transfer the cause back to the Clark Superior Court was denied. On December 5, 1984, Hughes filed a motion to transfer the cause back to the Clark Superior Court, stating that the judge of the Clark Superior Court consented to such transfer. In the alternative, Hughes also filed motions for changes of venue from both the judge and the county. A hearing was scheduled for January 3, 1984. At the hearing, the Clark Circuit Court, noting the consent of the Clark Superior Court, granted transfer of the cause to that court. The next day, January 4, the Clark Superior Court granted the State's motion for a trial date, and scheduled the trial for May 21, 1984. Hughes then filed three motions to dismiss the charges on the basis that her right to a speedy trial was being denied; all three were denied. Plea negotiations having come to naught, Hughes's trial began as scheduled on May 21, 1984.

At the trial, the State presented evidence as related above. In addition, John's older brother James, then eight years old, testified that he had witnessed several incidents of Hughes administering physical punishment to John.

Hughes presented testimony of friends and neighbors that served to deny and refute the State's allegations. Hughes's expert witness, Dr. Kasprisin, testified that John's head injury most likely resulted

from a fall from a crib, as Hughes claimed, and his numerous bruises were consistent with a certain blood disorder. He also testified that the hospital had not documented John's bruises nor tested for the blood disorder, as is the normal procedure in child abuse situations. Finally, Hughes herself testified, denying that she abused or neglected John, and maintaining that his injuries resulted from his own clumsiness.

On June 7, 1984, the jury returned its verdicts, finding Hughes guilty of all three counts. The trial court sentenced Hughes to a twelve-year term of imprisonment as follows: on Count I, neglect of a dependent child, Hughes received the presumptive two-year sentence, plus two years added for aggravating circumstances; and on Counts II and III, battery and involuntary manslaughter respectively, Hughes received the five-year presumptive sentences, with three years added for aggravating circumstances. The sentences on Counts I and III were to run consecutively; the sentence on Count II was to run concurrently with the other two. From the resultant twelve-year term of imprisonment, Hughes instituted this appeal.

## ISSUES

Hughes presents the following issues for our review:

 I. Was Hughes entitled to discharge under Ind. Rules of Procedure, Criminal Rule 4(C).

 II. Was the evidence sufficient to support the convictions.

 III. Did the trial court err in allowing unqualified persons to testify as experts.

 IV. Did the trial court err in certain evidentiary rulings.

 V. Did the trial court err in a pattern of rulings which denied Hughes both the right to confront witnesses and the right to present a defense.

 VI. Did Hughes's conviction for neglect of a dependent child constitute double jeopardy.

 VII. Did the trial court err by considering Hughes's lack of remorse as an aggravating sentencing factor.

 VIII. Did the State commit prosecutorial misconduct.

 IX. Did the trial court err, in rulings and acts, in projecting an image of partiality.

 X. Did the trial court err in failing to enforce a plea agreement.

## DISCUSSION AND DECISION

ISSUE I: *Criminal Rule 4(C) Discharge*

Hughes contends she was entitled to discharge under Ind. Rules of Procedure, Criminal Rule 4(C), which provides:

"No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time. Any defendant so held shall, on motion, be discharged."

Hughes having been charged and arrested on April 26, 1983, the one-year expiration date was April 26, 1984. However, Hughes's trial began 25 days after this date, on May 21, 1984.

As stated by the above rule, the time limitations therein shall be extended by the period of any delay caused by Hughes's

acts. C.R. 4(C); *Battle v. State* (1981), 275 Ind. 70, 415 N.E.2d 39. And Hughes is correct in stating any delays caused by a defendant's acts must reflect the actual delay which resulted. *Schuck v. State* (1980), Ind.App., 412 N.E.2d 838.

On November 28, 1983, the Clark Circuit Court, where the charges had been filed on November 18, scheduled Hughes's trial for February 21, 1984. On December 5, 1983, Hughes filed a motion seeking to transfer the case back to the Clark Superior Court, where the charges had been originally filed on April 26, 1983. At a hearing on January 3, 1984, the Clark Circuit Court granted the transfer. The next day, the Clark Superior Court scheduled Hughes's trial for May 21, 1984. On February 8, 1984, Hughes filed a motion for discharge, and a hearing was scheduled for March 19. At this hearing, Hughes's motion was properly denied as being premature. *See Banks v. State* (1980), 273 Ind. 99, 402 N.E.2d 1213.

The Clark Superior Court scheduled Hughes's May 21 trial on January 4. While a defendant is not required to take affirmative action to obtain a trial date within the period set by C.R. 4(C), when, prior to the expiration date set by the rule, the trial court sets a trial beyond the expiration date, it is the defendant's obligation to object *at the earliest opportunity*. *Little v. State* (1981), 275 Ind. 78, 415 N.E.2d 44; *McGary v. State* (1981), Ind.App., 421 N.E.2d 747. Hughes's trial was scheduled on January 4; she lodged no objection in any form regarding the trial date until February 8, 1984, more than a month after the cause had been set for trial beyond the one-year expiration date. Even then, no objection was filed; instead, a motion for discharge was filed which Hughes now acknowledges was premature. No reason is advanced for the delay. While it could be argued with some merit that Hughes's successful motion to transfer the cause from the Clark Circuit Court to the Clark Superior Court, thus vacating the timely trial date of February 21, 1984, was a delay chargeable to her, we need not address it. Her waiver of the right to a discharge is dispositive of this issue. The holdings of the cases cited above are explicit.

ISSUE II: *Sufficiency of Evidence*

Hughes claims the evidence is insufficient to support her convictions, as there was no direct evidence that she committed the crimes, and the circumstantial evidence did not exclude every reasonable hypothesis of innocence.

When the sufficiency of evidence is challenged, we will not weigh the evidence nor judge the credibility of the witnesses. Rather, we will consider only that evidence most favorable to the State and all reasonable inferences to be drawn therefrom which support the verdict. If there is substantial evidence of probative value which would permit a reasonable trier of fact to find the existence of each element of the offense beyond a reasonable doubt, the judgment must be affirmed. *Bowen v. State* (1985), Ind., 478 N.E.2d 44. Circumstantial evidence alone may support a conviction. *Grimes v. State* (1983), Ind., 450 N.E.2d 512. Contrary to Hughes's assertion, the circumstantial evidence need not overcome every reasonable hypothesis of innocence. *Cheney v. State* (1985), Ind., 486 N.E.2d 508. Circumstantial evidence is sufficient if an inference may reasonably be drawn from that evidence which supports the verdict. *Woodrum v. State* (1986), Ind.App., 498 N.E.2d 1318. Though evidence is circumstantial, a verdict upon which reasonable men may differ will not be set aside. *Brooks v. State* (1986), Ind., 497 N.E.2d 210. Moreover, our supreme court has held that where a person has the sole or exclusive opportunity to commit a crime, it is almost conclusive evidence of guilt. *See Hutchinson v. State* (1967), 248 Ind. 226, 225 N.E.2d 828; *Mobley v. State* (1949), 227 Ind. 335, 85 N.E.2d 489. In *Woodrum, supra,* and *Phelps v. State* (1983), Ind.App., 453 N.E.2d 350, we held that sole or exclusive opportunity, when coupled with other circumstances, may be sufficient to support a finding of guilt, and even the means and manner of death may be inferred from the proven circumstances.

Hughes argues the testimony of the lay witnesses was suspect and biased because many of them are related to one another, and they were part of an opposing faction in a dispute that was then occurring in Hughes's church. She contends the testimony of the medical personnel who treated John is insufficient because all but one could not rule out a crib fall as the cause of John's fatal blood clot, they could not recall with particularity the location and extent of John's bruises, and they did not follow the recognized documentation admission procedure when child abuse is suspected. Hughes claims the police investigation was biased and incomplete, and she points out inconsistencies in her son James's testimony. Finally, Hughes notes no witness actually saw John receive the fatal blow to his head.

In addition to pointing out the allegedly flawed testimony of the State's witnesses, Hughes summarizes the testimony of the defense witnesses, who described John as a happy and well loved, albeit clumsy child. She relates that she has consistently maintained her innocence and that the testimony of the expert witness for the defense, Dr. Kasprisin, showed that John's bruises were symptomatic of a blood disorder.

 Essentially, Hughes asks us to invade the province of the jury and accept the evidence presented by her as opposed to the State's evidence. This we may not do. *Bowen, supra.* The jury was aware of the witnesses' familial relationships and the existence of the factional dispute at the church. Regarding the medical evidence, we are cognizant of the fact that the testimony of doctors is almost always couched in terms of probabilities and possibilities, given the complexity of the human body. The failure to adhere to a hospital admission procedure is understandable because John was transported to the hospital by helicopter in an emergency situation. The fact that the medical staff was involved in an unsuccessful attempt to save John's life may also explain why their recollection of the location of bruises on his body lacked specificity. Finally, while it is true that no one actually witnessed the fatal blow to

John's head, witnesses did testify to other incidents where Hughes struck her son, and Hughes does not dispute the fact that at the time John sustained the fatal injury she had sole and exclusive custody of him. Again, circumstantial evidence alone may support a conviction. *Woodrum, supra; Phelps, supra.* We hold that the evidence is sufficient to support the convictions.

ISSUE III: *Expert Testimony*

Hughes asserts the trial court erred in allowing two doctors, Penelope Terhune and Alvin Martin, to testify as experts regarding the cause of John's blood clot because neither physician was board certified.

Whether or not a witness qualifies as an expert lies within the sound discretion of the trial court. *Rowan v. State* (1982), Ind., 431 N.E.2d 805. This court has held that to qualify a witness as an expert, the following two requirements must be met: (1) the subject matter of the witness' opinion must be shown to be so distinctly related to some scientific field or occupation as to be beyond the knowledge of the average lay person; and (2) the witness must be shown to have sufficient skill, knowledge, or experience in said field or occupation to indicate that the witness' opinion or inference will probably aid the trier of fact. *City of Indianapolis v. Robinson* (1981), Ind.App., 427 N.E.2d 902, *trans. denied.*

Hughes concedes that Drs. Terhune and Martin meet the first requirement of the test. She contends that neither physician was qualified to express an opinion as to whether the fatal blood clot resulted from a crib fall, as she contends.

 Dr. Terhune was John's attending physician while he was in the pediatric intensive-care unit. At the time, Dr. Terhune was in the second year of her three-year residency in pediatrics, and it was her responsibility to monitor and manage John's treatment. The bulk of Dr. Terhune's testimony pertained to John's treatment, and, given her experience in the pediatric intensive care unit, it was not an abuse of discretion for the trial court to allow her to testify as to whether John's head injury was likely to result from a crib fall. Re-

gardless, Dr. Terhune's opinion testimony was cumulative and was used to refute Hughes's contention that John had fallen from his crib. Thus, any error would be harmless. *Cornett v. State* (1983), Ind., 450 N.E.2d 498.

Dr. Martin was the physician who performed the autopsy on John. At the time of John's injury, Dr. Martin, although only in his first year as a resident pathologist, had performed over 200 autopsies; at the time of the trial, Dr. Martin had performed over 500 autopsies. Dr. Martin testified that, because John's brain did not have a corresponding injury on the side opposite the side of impact, he could not say that John's head was in motion when struck. This opinion refuted Hughes's claim that John was injured in a crib fall. Hughes argues that Dr. Martin's theory is not generally accepted in the field, and his testimony, based on an autopsy performed contrary to IND.CODE 36–2–14–6(d), was inadmissible.

■ First, Hughes failed to raise the issue of the general acceptability of Dr. Martin's theory at trial; therefore, she has waived this issue. *Hobson v. State* (1986), Ind.App., 495 N.E.2d 741. Second, John's emergency surgery and autopsy were performed in Kentucky. While IND.CODE 36–2–14–6(d) does require that autopsies be performed either by certified pathologists or licensed doctors supervised by certified pathologists, Hughes has not directed us to any Kentucky statutes. At the autopsy, Dr. Martin was supervised by a certified pathologist. Whether a witness is qualified to testify as an expert is within the court's discretion. *Forrester v. State* (1982), Ind., 440 N.E.2d 475. There was no abuse of discretion.

ISSUE IV: *Evidentiary Rulings*

Hughes claims the trial court repeatedly erred in its evidentiary rulings, allowing a significant amount of highly prejudicial, but minimally relevant, evidence to be admitted. Specifically, Hughes argues that Rodger Coy should not have been allowed to testify that she told him that she had an exorcism performed on John because she believed he was possessed by a "demonic spirit." *Record* at 1832. Hughes asserts that Juanita Neal and Lita Miller should not have been allowed to testify as to speculation that John was the product of an incestuous relationship between Tony's sister and stepfather. Hughes contends the trial court erroneously allowed several witnesses to testify as to her relative lack of affection for John vis-a-vis his brothers, as to remote incidents of discipline to John by Hughes, and as to John's general health and appearance. Hughes also asserts that the medical witnesses' opinion testimony was based on conjecture, chance, and possibilities. Finally, Hughes argues that Patricia Taylor was allowed to present hearsay testimony concerning Hughes's doctor's threat to have child abuse charges filed if Hughes brought her son James in one more time to be treated for a head injury. Hughes alleges that, taken together, these evidentiary rulings require reversal.

Evidence is relevant if it is material to an issue in a case, tends to make desirable inference more probable, and, in light of general experience, logically tends to prove or disprove some issue of fact. *Boyd v. State* (1986), Ind., 494 N.E.2d 284. Whether to admit evidence in a criminal proceeding is within the discretion of the trial court, and it is afforded wide latitude in ruling on the relevancy of evidence. *McGee v. State* (1986), Ind., 495 N.E.2d 537. Our supreme court has held that where there is a clear showing of imbalance between relevancy and tendency to prejudice the jury, certain evidence should not be admitted, although the cases cited by Hughes concern the admission of gruesome photographs. *Eddy v. State* (1986), Ind., 496 N.E.2d 24; *Chittenden v. State* (1982), Ind., 436 N.E.2d 86.

■ The testimony regarding Hughes's belief that John was possessed by a demonic spirit, her comparative lack of affection for him, and her concerns about his parentage is relevant to show her attitude towards him and a possible motivation for her to commit the charged crimes. As such, this evidence was admissible. *See Kahn v. State* (1986), Ind.App., 493 N.E.2d

790, *trans. denied.* Regarding the testimony describing John's general health, we are unaware of any authority prohibiting a witness from relating his observations of another's physical appearance. As to Hughes's allegation that the testimony of disciplinary incidents suffered from remoteness, we are unpersuaded by this contention, given John's short life in the Hughes home. Hughes's arguments go to the weight afforded this testimony, and not its admissibility.

■ As we discussed above, medical testimony is often phrased in terms of probabilities and inferences. *See Phelps, supra.* The testimony of the medical professionals was based upon treatment and examination of John. If the causes of his injuries could not be conclusively stated, it is because of the inherent nature of such evidence. Again, such argument goes to the weight of the evidence, and not its admissibility.

■ The alleged hearsay was offered by Patricia Taylor, a neighbor of Hughes who testified that Hughes told her that her (Hughes's) doctor had threatened to file child abuse charges against Hughes. Hughes's doctor died prior to the trial. Hughes claims this testimony was hearsay. We disagree, because Taylor's statement, attributed to Hughes, was not inadmissible as hearsay as it came within the exception to the hearsay rule for the admissions of a criminal defendant. *Lynk v. State* (1979), 271 Ind. 445, 393 N.E.2d 751. There was no error.

The trial court's evidentiary rulings were not erroneous. Therefore, taken together or singly, they do not require reversal.

ISSUE V: *Restricted Cross-Examination, Discovery, and Defense*

Hughes claims the trial court, in a series of rulings, denied her the rights to present a defense and cross-examine witnesses.

She argues that she was denied adequate discovery because the State failed to provide evidence of any criminal history regarding the investigating officer, Warren Stevens, and failed to produce all of the post-operative photographs taken of John, despite a pretrial discovery order requiring this production.

■ Where there has been a failure to comply with discovery procedures, the trial judge is usually in the best position to determine the dictates of fundamental fairness and whether any resulting prejudice can be eliminated or satisfactorily alleviated. *Reid v. State* (1978), 267 Ind. 555, 372 N.E.2d 1149. Although the State did not provide Hughes with Stevens's criminal record the trial judge, in her ruling, noted that Stevens's position required such record checks and that Hughes had not provided concrete information that Stevens had a criminal history. The trial judge then allowed Stevens to be questioned outside the presence of the jury, and he related only a 1967 traffic violation. We believe this was sufficient to alleviate any harm to Hughes.

Hughes also claims that the State failed to produce all of the post-operative photographs taken of John. The State admitted two such photographs into evidence, but a State witness, on cross-examination, testified that as many as eight were taken.

■ Our supreme court has held that a conviction may be reversed when the police destroy or withhold material evidence. *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645, *cert. denied* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77. The record shows that, while the witness did state that as many as eight photographs were taken, she also noted that several were duplicates, because the photographer was using a Polaroid camera. Moreover, Hughes failed to move for introduction of the allegedly withheld photographs, so any error was waived. *Hobson, supra.* Regardless, inasmuch as Hughes objected to the photographs as being inflammatory and prejudicial, we fail to see how she was harmed by not having more of them admitted. There was no error.

Hughes contends she was denied the right to confront witnesses because her cross-examination of certain witnesses was curtailed. Specifically, Hughes claims she was prevented from questioning former members of the church to which she be-

longed regarding a factional dispute over the retention of the minister and its effect on their personal biases. She also claims she was not allowed to delve into the psychiatric treatment history of witnesses Lita Miller and Wanda Coy. Hughes asserts she was precluded from questioning Lita Miller about prior reports of child abuse. Finally, Hughes claims she was denied the opportunity to ask Wanda Coy and Tamera Coy questions concerning their parental practices and experiences, which she alleges are relevant because these witnesses testified they considered Hughes's discipline of John too severe.

The trial judge is allowed to control the conduct of cross-examination, and we will find reversible error in his rulings thereon only if it is an abuse of discretion. *Baird v. State* (1986), Ind., 497 N.E.2d 538; *Hunt v. State* (1983), Ind., 455 N.E.2d 307.

■ Our review of the record reveals that, although on one occasion Hughes was prevented from asking about the factional dispute because the question concerned the testimony of a previous witness, at all other times Hughes was allowed to pursue this line of questioning as far as she wished. Regarding the psychiatric treatment histories, Hughes was allowed to question Lita Miller regarding the fact that Miller suffered from globushysteria, had been treated by a psychiatrist, and had been prescribed medication for her nerves. During cross-examination of Wanda Coy, Hughes was allowed to reveal that Coy had suffered a nervous breakdown and had received shock treatment, upon learning that her husband had been wounded in Viet Nam. In both instances Hughes was allowed to show that the witnesses had undergone psychiatric treatment, so any possible effect it had on their credibilities was placed before the jury. Hughes's cross-examination of Lita Miller regarding whether Miller had previously reported any instances of child abuse was restricted to reports involving Hughes. Similarly, Hughes questioning of several witnesses as to their own standards of child discipline was limited to general parenting practices, and she was not allowed to delve into specifics. In

preventing the cross-examination of witnesses from straying too far afield, the trial court did not abuse its discretion.

Hughes also claims the trial court erred in granting the State's motion in limine, which excluded evidence of Hughes's offer to take a polygraph examination. In her brief Hughes acknowledges that the supreme court has upheld the exclusion of such evidence absent a stipulation by both parties, in *Moore v. State* (1977), 267 Ind. 270, 369 N.E.2d 628, but asks us to "review" that decision. The holdings of *Moore* and the more recent *Minneman v. State* (1982), Ind., 441 N.E.2d 673, *cert. denied*, 461 U.S. 933, 103 S.Ct. 2099, 77 L.Ed.2d 307, are binding upon this court. The trial court properly excluded the evidence.

■ Hughes claims the State referred to both new facts and new points in closing final argument that were not mentioned in opening final argument. Therefore, Hughes contends the trial court erred in denying her an additional argument in which to respond to the new points and facts.

IND. CODE 35-37-2-2(4), in pertinent part, provides:

> "[T]he prosecuting attorney shall disclose in the opening all the points relied on in the case, and if in the closing he refers to any new point or fact not disclosed in the opening, the defendant or his counsel may reply to that point or fact, and that reply shall close the argument of the case...."

The conduct of final argument is within the trial court's discretion. *Faust v. State* (1977), 266 Ind. 640, 366 N.E.2d 175. The record shows that the alleged new facts and points were referred to in the opening final argument and were referred to in closing final as a response to portions of Hughes's final argument. The trial court did not abuse its discretion in denying Hughes a second closing argument.

Finally, Hughes argues the trial court erred in several instances regarding the testimony of her son, James. Specifically, she asserts she was denied adequate opportunity to interview James during discovery,

the State was allowed to rehabilitate James through hearsay, and she was not allowed to call James on surrebuttal to counter the rehabilitation.

 The defense was allowed to depose James during discovery. On the first day of trial, and again when James was found competent to testify, Hughes requested an interview with James, apparently to discern if his relation of the events had changed in light of interviews with the State. Both requests were denied. Hughes claims she was prejudiced by the denials. However, Hughes, of her own volition, declined to cross-examine James. Hughes could have accomplished in cross-examination what she sought in an interview. Because she declined the opportunity, Hughes has waived any error. *See Roll v. State* (1985), Ind.App., 473 N.E.2d 161.

Hughes claims it was error to allow a State witness to rehabilitate James's testimony through hearsay. However, the record shows, and Hughes admits in her brief, that the defense was allowed to impeach James using his deposition, although the deposition was not published, through questioning of James's guardian at litem, who was present at the deposition. Given the fact that James testified, and Hughes had the opportunity to cross-examine him, there was no error. *Watkins v. State* (1983), Ind., 446 N.E.2d 949.

Following the State's rehabilitation of James's testimony, Hughes attempted to call James for the purpose of surrebuttal. The trial court denied the request and Hughes claims this was error.

The permitting of surrebuttal testimony is a matter of trial court discretion. *Rinard v. State* (1976), 265 Ind. 56, 351 N.E.2d 20. Such rulings will not be disturbed unless there is a manifest abuse of that discretion. *Id.* No offer to prove was made at trial and we are not presented with any proposed testimony that would have been anything other than cumulative and repetitive. It was not reversible error to refuse surrebuttal.

We are unpersuaded that the alleged errors, taken alone or together, denied Hughes either the right to present a defense or the right to confront witnesses.

ISSUE VI: *Double Jeopardy*

Hughes claims she was subjected to double jeopardy in that the charges for battery and neglect of a dependent child both stemmed from the same alleged act, the infliction of the fatal blow to John's head.

Hughes was charged as follows. Count I, charging neglect of a dependent child, reads in pertinent part:

"[Hughes] having the care, custody and control of [John], a dependent, did knowingly place [him] ... in a situation that endangered his life and health, to-wit: by inflicting cruel and vicious blows upon said dependent resulting in numerous and repeated injuries being harmful to the emotional and physical well-being of her dependent...."

*Record* at 80.

Count II, the battery count, stated that Hughes:

"[D]id knowingly touch [John] in a rude, insolent and angry manner, to-wit: by inflicting cruel and repeated blows upon [John] ... resulting in serious bodily injuries, to-wit: broken bones, severe bruises and blood clot to the head area...."

*Record* at 80.

Count III charged Hughes with involuntary manslaughter, because John was killed as a result of the battery.

 As stated by our supreme court, the test for determining whether offenses are the same for double jeopardy purposes is:

" '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.' "

*Elmore v. State* (1978), 269 Ind. 532, 534, 382 N.E.2d 893, 895 (quoting *Blockburger v. U.S.* (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306). That is, there is no double jeopardy where two offenses share an identical element and where there is a

substantial overlap in the proof. *Flowers v. State* (1985), Ind., 481 N.E.2d 100.

The facts in the case at bar are similar to those of *Bean v. State* (1984), Ind., 460 N.E.2d 936. In *Bean*, the defendants had been charged with both neglect of a dependent and involuntary manslaughter resulting from neglect of a dependent. In affirming the convictions, Justice Pivarnik held, for a unanimous court, that there was probative evidence to show a continual pattern of acts constituting neglect independent of the acts causing the death of the dependent. *Id.* at 943.

▉ Here, the testimony of several witnesses related the series of injuries suffered by John, including a swollen arm, a soft bulbous area at the back of his head, a "necklace" of bruises under his chin, bruises on his buttocks, the imprint of what appeared to be a soap dish, and a burn on his hand. Witnesses who observed John at the time of his emergency surgery testified to the existence of several bruises in various stages of healing. These acts are separate from the battery, the blow to John's head, that directly resulted in his death. Thus, even if the acts of neglect may overlap with some of the acts contained in the battery charge, there is no double jeopardy, under *Flowers, supra,* and *Elmore, supra.*

Hughes also claims the trial court erred in sentencing her on the neglect of a dependent child charge because, in *Smith v. State* (1980), Ind.App., 408 N.E.2d 614, we held it was improper to sentence a defendant for neglect of a dependent when a sentence was imposed for the greater offense of involuntary manslaughter.

Although Hughes correctly cites our holding in *Smith*, she applies it to the wrong conviction. In *Smith*, the trial court imposed sentences for both neglect of a dependent and involuntary manslaughter. We held that this was error because where conviction of the greater crime, involuntary manslaughter, cannot be had without conviction of the lesser crime, neglect of a dependent, double jeopardy bars separate sentencing. *Id.* at 622.

▉ Here, battery was the underlying offense that gave rise to the felony manslaughter, and it was error to impose a sentence on the battery conviction because a sentence was also imposed on the greater offense, involuntary manslaughter. Therefore, the sentence imposed upon Hughes's conviction for battery must be vacated.

ISSUE VII: *Sentencing*

Hughes argues the trial court erred in improperly considering lack of remorse as an aggravating factor. The presumptive sentence for a conviction of neglect of a dependent child, a Class D felony, is two years, to which two years may be added for aggravating circumstances, or one year deducted for mitigating circumstances. IND. CODE 35–50–2–7(a). The presumptive sentence for involuntary manslaughter, a Class C felony, is five years, which may be enhanced by three years for aggravating circumstances, or decreased by three years for mitigating circumstances. IND. CODE 35–50–2–6. The trial court enhanced Hughes's conviction for neglect of a dependent child by two years, and her involuntary manslaughter conviction by three years.

▉ When a trial court uses its discretionary power to increase or decrease the basic sentence, the record must disclose what factors were considered to be mitigating or aggravating circumstances. *Howard v. State* (1984), Ind., 459 N.E.2d 29. The record must further show that the determination of the sentence was based upon a consideration of the facts of the specific crime and the relation of the sentence imposed to the objectives which will be served by that sentence. *Id.* The aggravating factors which may be considered are set out in IND. CODE 35–38–1–7. However, the listed factors are not exclusive, and the trial court may, in its discretion, consider other relevant factors. *Mullens v. State* (1983), Ind., 456 N.E.2d 411.

At the sentencing hearing, the trial court made the following statement:

"As a basis for the increased sentences, the Court will make a finding that the following aggravating [sic] circumstanc-

es have been taken into consideration. First and foremost of course, is the age of the victim, who is a twenty month old child. We will take into consideration, and did take into consideration the desparity [sic] of the position between the defendant and the victim. We would note for the record that the victim was a small adopted child. The defendant was this child's caretaker. This child came into this home when he was bare [sic] five or six months old. And at the age of twenty months, he was dead. Having been in defendant's almost constant and sole care, and custody, the Court will note for the record the manner in which this crime was committed and in which the victim died. The evidence that was presented and the testimony of the medical profession as to the severe injury and there [sic] opinion that this was a clear case of severe child abuse, which had gone on over a period of time, that the Court most certainly must take into consideration as to how the child was injured and how he died. The Court will note for the record, the apparent and I say this apparent lack of remorse or regret by the defendant as indicated by her total denial, or explanation of the bruises, how they came about or her knowledge of bruises, her total denial that there were bruises, notwithstanding testimony of the eye witnesses that saw the defendant administer violent treatment. The Court will note for the record that a lenient sentence or probation in this instance, would depreciate the seriousness of the crime, and because of the defendant's apparent lack of remorse or regret, the Court will make a finding that defendant is in need of correctional or rehabilitation treatment that can best be provided by her commitment to a penal facility...."

*Record* at 3147–50.

 The trial court relied on more than Hughes's lack of remorse in enhancing her sentences. Regardless, Indiana cases have consistently held that lack of remorse is a proper sentencing consideration. *Brooks, supra; Mullens, supra; Coleman v. State* (1983), Ind.App., 409 N.E.2d 647. The trial court sufficiently articulated its reasons

for imposing the enhanced sentences. We will not disturb its decision.

ISSUE VII: *Prosecutorial Misconduct*

Hughes alleges she was the victim of prosecutorial misconduct, including two evidentiary harpoons and improper closing argument.

The standard for determining whether prosecutorial misconduct occurred is whether the conduct under all of the circumstances placed the defendant in a position of grave peril to which he should not have been subjected. This position is measured by the persuasive effect of the misconduct on the jury's decision and whether there were repeated instances of misconduct which would evince a deliberate attempt to improperly prejudice the defendant. *Rock v. State* (1979), 270 Ind. 658, 388 N.E.2d 533; *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843. The existence of prosecutorial misconduct does not therefore necessarily constitute reversible error. A judgment will not be set aside because of a charge of misconduct of counsel in the absence of a clear showing of prejudice or an abuse of discretion by the trial court. *Henderson v. State* (1977), 173 Ind.App. 505, 364 N.E.2d 175, *trans. denied.*

 The first act of alleged misconduct occurred when the prosecutor asked a medical witness if John's fatal injury could have been caused by his being thrust against a wall. Hughes objected, on the basis that the State's theory of the case precluded that possibility, and moved for a mistrial. The trial court denied the mistrial motion, but admonished the jury to disregard the question and admonished the prosecutor to refrain from asking such questions.

The granting of a mistrial lies within the trial court's discretion, and no reversible error will normally be found if a jury is admonished to disregard what has occurred at trial. *Tinnin v. State* (1981), 275 Ind. 203, 416 N.E.2d 116. The trial court's admonishment was sufficient to cure the improper question.

Hughes claims she was prejudiced by the prosecutor's evidentiary harpoon. During the cross-examinations of defense-witness Roxanne Gregory and Hughes, the prosecutor inquired if they had made obscene or gagging gestures in public to State-witness Lita Miller, and he apparently acted out the gestures during the questioning. Both Gregory and Hughes denied making the gestures, and objections to this line of questioning were overruled.

 An evidentiary harpoon is improper evidence calculated by counsel to prejudice the jury against the defendant and his defense. *Collins v. State* (1981), Ind., 429 N.E.2d 623. We are of the opinion that the line of questioning, while perhaps distracting the jury unnecessarily, was not particularly damning. Juries are aware of the inherent antagonism between the prosecution and the defense engendered during trials, especially a lengthy, highly publicized trial as was involved here. We do not believe Hughes was prejudiced by the episodes.

Finally, Hughes argues the State conducted improper final argument, including referring to four analogous appellate cases and making inflammatory personal comments.

Concerning three of the comments, Hughes failed to object to them. Therefore, the allegations are waived. Even so, it is proper for prosecutors during closing argument to state and discuss the evidence and all reasonable inferences to be drawn therefrom, *Marsillett v. State* (1986), Ind., 495 N.E.2d 699, and statements of opinion are not prohibited. *Faust, supra.*

Hughes moved for a mistrial when the prosecutor referred to the facts of four analogous appellate decisions, concerning the sufficiency of evidence. The trial court properly denied the mistrial motion, as the supreme court has consistently upheld the reading from decisions to the jury in final argument. *See Griffin v. State* (1981), 275 Ind. 107, 415 N.E.2d 60, and cases cited therein at 65.

Finally, Hughes moved for mistrial again in response to the following statement by the prosecutor during final argument:

"[P]erhaps we cannot prevent this world from being a world in which children are tortured, but we can reduce the number of tortured children and if you don't help us, who else in the world...." *Record* at 3004. The trial court denied the mistrial, and Hughes did not seek an admonishment.

While a similar comment was held to be "unnecessary," "unprofessional," and an "improper exaggeration" in *Warner v. State* (1976), 265 Ind. 262, 265–6, 354 N.E.2d 178, 181, it did not require reversal. Neither does it here.

In summary, the record contains comments of both sides that at times constitute intemperate advocacy. But trials are not conducted in a vacuum, nor do we believe they should be. While such comments are not to be condoned, neither can they be avoided.

ISSUE IX: *Judicial Partiality*

Hughes argues that the trial court, in certain acts and a pattern of rulings, projected to the jury an appearance of partiality, depriving her of a fair trial.

"A trial court should refrain from making unnecessary comments and should remain impartial. Moreover, a trial judge's conduct should be such that his remarks or apparent attitude do not impart to the jury an appearance of partiality. It is important, however, that the trial court control the proceedings by taking responsible steps to insure that proper discipline and order exist in the courtroom."

*Marbley v. State* (1984), Ind., 461 N.E.2d 1102, 1107. The trial court must strike a balance between impartiality and control. Rulings on procedural and evidentiary questions by nature are adverse to one of the parties, but partiality cannot be inferred from proper rulings. *Brooks, supra.*

Hughes cites four examples that she claims are evidence of the judge's partiality, resulting in her being prejudiced in the eyes of the jury.

In denying Hughes's request for a second final argument, the judge stated, "We are going to get on with this case and I've

heard all the arguments and objections that I intend to hear. That's a matter for appeal, if necessary." *Record* at 3060. Hughes objected to the comment and moved for a mistrial, which was denied. The judge admonished the jury to disregard the comment.

Hughes's second illustration of judicial partiality is the trial court's denial of the jury's request to view certain exhibits during deliberations. Hughes did not object to the request, but the State did, on the basis that the jury would place undue weight on the exhibits in arriving at the verdicts. Hughes claims the trial court's ruling amounts to a comment as to the probative value of the exhibits.

The third allegation of partiality relates the trial court's statement, in sustaining a defense objection to a question propounded by the State, that, "[I]t's the Court's opinion this question has already been answered very specifically by the doctor. The doctor has stated his conclusion was that the child suffered from abuse." *Record* at 1310. Hughes objected to the comment and moved for a mistrial which, after oral argument outside the jury's presence, was denied. Hughes claims the comment caused the jury to place undue weight upon the trial judge's recollection of the doctor's testimony.

The final example of judicial partiality is Hughes's contention that the trial judge failed to produce an adequate record, because the conferences at the bench were inaudible, and several other portions of the trial were inaudible and were unable to be reproduced in the record.

Regarding Hughes's first example, while the trial court has a duty to refrain from making unnecessary comments or remarks, *Lawson v. State* (1980), 274 Ind. 419, 412 N.E.2d 759, we fail to see how the trial judge's comments show that she abandoned her impartiality.

■ Secondly, it is within the trial court's discretion whether to permit the taking of documentary evidence or exhibits into the jury room. *Thomas v. State* (1972), 259 Ind. 537, 289 N.E.2d 508. Given the length of the trial and the amount of

evidence generated, we do not believe the trial court abused its discretion in denying the jury's request to view certain exhibits.

■ The third alleged error is nothing more than the trial court's explanation that it was sustaining a defense objection on the basis that the question had already been asked and answered. The trial court did not adopt the doctor's conclusion as its own, and there is no prejudice from the comment necessitating a new trial. *See Cornett, supra* at 505–6.

Regarding the inaudible portions of the trial, our review of the record shows that the inaudibility was the result of Hughes's counsel speaking at an inaudible volume, evidenced by the court reporter's notations and the prosecutor's repeated requests that Hughes's counsel speak louder. Moreover, Hughes does not show how she was prejudiced by the bench conferences being inaudible; it is Hughes's responsibility to provide an adequate record.

In summary, Hughes's allegations of partiality are nothing more than the trial court maintaining control of the proceedings. There was no error.

ISSUE X: *Plea Agreement*

Hughes contends the trial court erred in failing to order specific performance of a plea agreement. As evidence of the terms of the plea agreement Hughes cites us to the record, which contains the trial court's notes of plea negotiations at a May 9, 1984 pre-trial conference and an "Acknowledgement" signed only by Hughes.

■ By statute, plea agreements on felony charges must be submitted to the trial court in writing. IND.CODE 35–35–3–3(a)(1). This court has held that a plea agreement not in writing as so required may not be specifically enforced. *Hunter v. State* (1985), Ind.App., 477 N.E.2d 317; *Naked City, Inc. v. State* (1984), Ind.App., 460 N.E.2d 151. There being no valid plea agreement before the trial court, there could be no error in failing to enforce it.

Accordingly, for the above reasons, this cause is remanded to the trial court with instructions to vacate Hughes's sentence

on her conviction of battery. The judgment is in all other things affirmed.

Judgment affirmed and remanded w/instructions.

ROBERTSON, J., concurs.

RATLIFF, C.J., concurs with opinion.

RATLIFF, Chief Judge, concurring.

In discussing the admissibility of expert testimony, the majority opinion states there are two requirements which must be met to qualify a witness as an expert. First, the subject matter must be distinctly related to some scientific field or occupation as to be beyond the knowledge of the average lay person, and, second, the witness must be shown to have sufficient skill, knowledge, or experience in that field to indicate the opinion of that witness probably will aid the trier of fact. The majority cites, *City of Indianapolis v. Robinson* (1981), Ind. App., 427 N.E.2d 902, *trans. denied*, at 1296.

While the majority opinion correctly reflects the traditional rule as to qualification of expert witnesses, in my view, the first requirement is not in keeping with the modern view of expert testimony. The clear trend of authority is to focus upon the training, experience, and qualifications of the expert and whether the expert's opinion will assist the trier in performing its fact-finding functions, and to reject the premise that the subject of the opinion must be beyond the knowledge of the average lay person. In discussing this rule in *Summers v. State* (1986), Ind.App., 495 N.E.2d 799, 802–03, *trans. denied*, we said:

"An expert witness is one who, by reason of education or special experience, has knowledge concerning a subject matter about which persons who have no particular training are incapable of forming an accurate opinion or making a correct decision. *Wade v. State* (1986), Ind., 490 N.E.2d 1097; *Moody v. State* (1983), Ind., 448 N.E.2d 660. The trial court has broad discretion in determining the qualifications of an expert and in admitting opinion evidence. The sufficiency of the foundation for opinion evidence is a matter committed to the sound discretion of the trial court whose decision will be reversed only for an abuse of that discretion. *Id.*

"Although it has been said that an expert witness must have observed facts sufficient to enable him to form a valid opinion, *McFarland v. State* (1978), 269 Ind. 385, 381 N.E.2d 85, those facts may be supplied in the form of a hypothetical question which incorporates facts previously adduced at the trial. *Ashby v. State* (1985), Ind., 486 N.E.2d 469; *Brown v. State* (1979), 271 Ind. 129, 390 N.E.2d 1000.

"It also has been said that expert testimony is inappropriate and may be excluded from evidence when it concerns matters within the common knowledge and experience of ordinary persons and which the jury may determine as well as the expert. *Breese v. State* (1983), Ind. App., 449 N.E.2d 1098, *trans. denied; City of Bloomington v. Holt* (1977), 172 Ind.App. 650, 361 N.E.2d 1211, *trans. denied; Rosenbalm v. Winski* (1975), 165 Ind.App. 378, 332 N.E.2d 249, *trans. denied.* However, if appropriate, opinion testimony by an expert witness even as to an ultimate fact in issue is not objectionable for the reason that it invades the province of the trier of fact. *Breese*, at 1111. To qualify as an expert, it has been said that two requirements must be met: (1) the subject matter must be related to some scientific field beyond the knowledge of the average lay person, and (2) the witness must be shown to have sufficient skill in that area so that his opinion probably will aid the trier of fact in its search for the truth. *Grimes v. State* (1983), Ind., 450 N.E.2d 512. The trend of recent cases seems to focus more attention on the knowledge and skill of the expert and whether the expert's opinion will be helpful to the trier of fact than on the question of the knowledge of the jury. *See* E.W. Cleary, *McCormick on Evidence*, at 33 (3d ed. 1984). This standard is incorporated in Fed.Rule of Evidence 702, which provides:

'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'

"In commenting upon Fed.R.Evid. 702, one authority has said:

'Must a court exclude expert testimony if the subject is within the comprehension of the average juror? Such a test is incompatable with the standard of helpfulness expressed in Rule 702. First, it assumes wrongly that there is a bright line separating issues within the comprehension of jurors from those that are not. Secondly, even when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bring to bear on the same issue which would be helpful.'

3 J. Weinstein and M. Berger, *Weinstein's Evidence*, § 702(02) (1985).

"We believe the above quoted comment from *Weinstein*, although directed to Fed.R. of Evid. 702, is appropriate to our consideration of this issue. The modern trend is away from strict application of the rule excluding expert testimony on subjects within the common knowledge of jurors. *Carlson v. Hudson* (1974), 19 Ill.App.3d 576, 312 N.E.2d 19; *Stanley v. Board of Education* (1973), 9 Ill.App.3d 963, 293 N.E.2d 417.

'Traditionally, expert testimony has not been permitted when its subject matter is not beyond the knowledge and experience of the average juror [citation omitted], but more recently, the trend is to permit it if the expert has some special knowledge and his testimony is of aid to the jury even though the average juror would also have some knowledge of the subject matter. [Citations omitted.]'

*Binge v. J.J. Borders Construction Co.* (1981), 95 Ill.App.3d 238, 50 Ill.Dec. 788, 791, 419 N.E.2d 1237, 1240. The modern standard for admissibility of expert testimony is whether that testimony will aid the jurors in understanding the facts. *Johnson v. Commonwealth Edison Co.* (1985), 133 Ill.App.3d 472, 88 Ill.Dec. 449, 478 N.E.2d 1057. In order to be admitted into evidence, the expert testimony must assist the trier of fact in understanding the evidence or deciding a factual issue, and the witness must be qualified by knowledge, skill, experience, training, or education to give such testimony. *Ruffiner v. Material Service Corp.* (1985), 134 Ill.App.3d 747, 89 Ill. Dec. 414, 480 N.E.2d 1157."

Under the modern trend, the testimony of Doctors Terhune and Martin clearly would have aided the jury in reaching a decision, and the witnesses were shown to be sufficiently skilled by training, education, and experience to meet the qualification requirement for expert opinion testimony. Further, even under the traditional rule, the subject of their testimony related to a scientific field beyond the knowledge of the average lay person, thereby meeting the first requirement of the traditional rule for allowance of such evidence. The second requirement clearly was met.

Although in this case, both requirements of the traditional rule as to qualifications of expert witnesses were met, I think we do not aid the fact finding process by continuing to adhere to outmoded concepts. By continuing to refer to the requirements of the traditional rule, we are regressing from our prior decision in *Summers*. Thus, as we did in *Summers*, I would elect to follow the modern rule as to expert testimony.

With the foregoing reservation concerning the appropriate standard by which to determine the qualifications of expert witnesses, I concur.